[No. 60035-0.   En Banc.   July 8, 1993.]

*In the Matter of the Marriage of* MARCIA JEAN
KOVACS, *Respondent, and* JOHN E.
KOVACS, *Petitioner.*

*Kevin O'Shaughnessy,* for petitioner.
*Michael F. Keyes,* for respondent.

ANDERSEN, C.J. —
## FACTS OF CASE

The father in this marriage dissolution action seeks review of a Court of Appeals decision which reversed the trial court's order awarding primary residential care of the parties' three minor children to the father rather than to the mother. The father argues that the Court of Appeals applied the wrong legal standard when it held that the parent who has been the primary caregiver of the children during marriage must be designated as the primary residential parent in a dissolution action, unless that parent's personality, conduct or parenting style is found to have had an adverse impact on the children.[1] We agree with the father and reverse the Court of Appeals.

John and Marcia Kovacs were married in August 1982. At the time of the marriage John owned a small janitorial business in Alaska and Marcia was working in a restaurant.

The Kovacs have three children, Johnny, who is now 10 years old; Courtney, who is 9 years old; and Billy, who is 6 years old. During the marriage Marcia generally stayed at home to care for the children and the family home while John worked outside the home to financially care for the family. Marcia worked outside the home for only a short time prior to the separation.

In 1984, John was forced to sell his janitorial business to meet an IRS obligation. He worked for the new owner of the business for a time, but problems developed in the employment relationship and John was fired in the spring of 1988.

After John lost his job, the couple decided to move to California where job opportunities appeared to be better than those in Alaska. The couple agreed that Marcia would stay with the children in Spokane, where Marcia's parents lived, until John was able to find a job and housing in California. Marcia and the children moved to Spokane in late April 1989. They lived with Marcia's parents until the

---

[1] *In re Marriage of Kovacs*, 67 Wn. App. 727, 730-31, 840 P.2d 214 (1992).

Kovacs' furniture arrived and Marcia was able to move into a duplex owned by her parents. John joined the family 3 or 4 weeks later, on May 22, 1989. Then, in mid-June, John went to California to look for work.

He found a job in California on August 18, 1989, and later moved into a 3-bedroom townhouse in a planned residential community in Irvine, California. Marcia traveled to Irvine in October 1989 to see the new home but did not tell John at that time that she intended to file for dissolution of their marriage. It was not until John arrived in Spokane in November 1989 to move his family to California that Marcia told him the marriage was over. John returned to California and Marcia remained in Spokane with the three children.

She apparently filed a petition for dissolution of marriage in Spokane County Superior Court on December 20, 1989. A *temporary* parenting plan, awarding Marcia primary residential placement of the children pending final resolution of the action, was apparently entered in March 1990.[2]

Testimony before the trial court indicated that Marcia was the primary caregiver and was generally responsible for the day-to-day care of the children's needs during the marriage and during the period of separation.

The record reflects the problems that existed within the family and with each parent.

During the approximately 18 months the couple was living apart, Marcia became romantically involved with another man, she left the children with various relatives during times when she was traveling to and from the man's home in Olympia, and was cited for two alcohol-related driving offenses. She was arrested for driving while under the influence of alcohol in October 1989 after she was involved in an automobile accident. The children, who were in the automobile at the time, were temporarily removed from Marcia's care and placed in a foster home for 2 days.

At trial both parents sought primary residential placement of the children.

---

[2] Neither the petition nor the temporary order is included in the record on appeal.

Both parents had apparently agreed to be evaluated by the father's expert witness, a clinical psychologist. The psychologist interviewed each parent alone, administered personality tests to each parent, observed the children alone and observed each parent with the children. With the information gained through the testing, the interviews and observation the psychologist concluded that Marcia has a personality disorder. The psychologist testified that although an individual with a personality disorder could "get by as a parent", the personality disorder would inevitably affect parenting.

The psychologist testified that although the children were "adequately adjusted", they appeared to respond better to the father's directions than the mother's. He stated that the oldest child was the most difficult of the three to manage and that child needed the firm limit setting that the father was able to provide. While stating the question was "relatively close", the psychologist recommended that the father be awarded primary residential placement of the children because the father "is a more stable individual who will provide a more structured stable environment for the children."

The mother's expert was a counselor who met the mother for the first time just a few days before trial. She observed the mother and children together the day before trial began. The counselor did not administer any tests and did not meet the father. The counselor recommended the children be placed with the mother. The counselor said she found the children to be "in pretty good shape, so whatever either parent has done, they must have done a pretty good job." She also said the children told her that they wanted to live with their mother. The counselor, noting that the mother was the primary caregiver of the children, stated, "Children can get along without a lot of things, but they don't get along well without nurturing from a mother."

The trial court followed the recommendation of the father's expert and awarded primary residential placement of the children to the father. The children moved to their father's

home in California in January 1991, just a few days after the conclusion of the trial, and have continued to reside there during this appeal. A stay of the trial court's order was denied by the Court of Appeals on January 18, 1991.

On appeal the Court of Appeals reversed the trial court's order, and remanded for a new trial, holding that placement with the parent who had acted as the primary caregiver was *required* unless the child had been harmed by the conduct of the primary caregiver. *In re Marriage of Kovacs*, 67 Wn. App. 727, 730-31, 840 P.2d 214 (1992). We granted the father's petition for review.

One issue is presented.

## ISSUE

Does the Parenting Act of 1987 create a presumption that placement of a child with the parent who has been the primary caregiver is always in the child's best interests absent proof that the primary caregiver's personality, conduct or parenting style has harmed the child's physical, mental or emotional well being?

## DECISION

CONCLUSION. The Parenting Act of 1987 does not create a presumption in favor of placement with the primary caregiver. Instead, the Act requires consideration of seven factors and provides that the child's relationship with each parent be the factor given the greatest weight in determining the permanent residential placement.

We have not yet construed the residential provisions of the Parenting Act of 1987 (hereinafter Parenting Act or the Act), Laws of 1987, ch. 460.

Washington's Parenting Act represents a unique legislative attempt to reduce the conflict between parents who are in the throes of a marriage dissolution by focusing on continued "parenting" responsibilities, rather than on winning custody/visitation battles.[3] The Act replaced the terms "cus-

---

[3]*See generally* 1987 Proposed Parenting Act Commentary and Text (available at Wash. State Archives) (hereinafter Commentary) (This Commentary was subsequently edited and replaced by the drafting committee. The amended

tody" and "visitation" with the concepts of "parenting plans" and "parental functions".[4] Ordinarily parents involved in a marriage dissolution action are required to develop a parenting plan that: (1) provides for a method of resolving future disputes about the children; (2) allocates decisionmaking between the parents; and (3) makes residential provisions for each child.[5] It is only the *residential placement* of the parties' children that is at issue in the present case.

In ordering a parenting plan, the trial court is required to provide for the residential schedule or placement of the child.[6] The residential placement is to be in the best interests of the child[7] and is to be made only after certain factors have been considered by the court.[8] The Parenting Act revised the factors previously considered by the trial court under former law, but continues to give the trial court broad discretion when making the determination.[9]

A trial court's ruling dealing with the placement of children is reviewed for abuse of discretion.[10] A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.[11]

---

version of the Commentary is not part of the legislative record.); *see also* 2 Washington State Bar Ass'n, *Family Law Deskbook* 45-3, 45-4 (1989).

[4]Commentary, at 2; RCW 26.09.004.

[5]RCW 26.09.181, .184(2). Any provision of the parenting plan will or may be limited if the trial court finds any one of a number of factors set forth in RCW 26.09.191. None of the limiting factors are alleged to exist in this case.

[6]RCW 26.09.184(5); RCW 26.09.187(3).

[7]RCW 26.09.002.

[8]RCW 26.09.187(3).

[9]*See, e.g.*, RCW 26.09.187(3)(a).

[10]*In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983) (in matters dealing with the welfare of children, trial courts are given broad discretion); *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981) (appellate courts are reluctant to disturb child custody dispositions because of the trial court's unique opportunity to personally observe the parties).

[11]*Hizey v. Carpenter*, 119 Wn.2d 251, 268, 830 P.2d 646 (1992); *In re Marriage of Tang*, 57 Wn. App. 648, 653, 789 P.2d 118 (1990).

In the present case the Court of Appeals held that the trial court abused its discretion because it failed to find circumstances supporting a "change" of placement from the primary caregiver (the mother) to the father.[12] In ruling as it did, the Court of Appeals relied on a 1975 case, *Wildermuth v. Wildermuth*, 14 Wn. App. 442, 542 P.2d 463 (1975). Although *Wildermuth* was a *modification of custody* case, the Court of Appeals found the language of the former modification statute and the language of the policy section of the Parenting Act of 1987 to be similar.[13]

The Court of Appeals interpreted the Parenting Act to *require* placement with the parent who has provided the primary daily care of the child, unless the trial court finds that the personality or parenting style of the primary caregiver has resulted in harm to the child.[14]

The language from the Act which the Court of Appeals believed compelled this conclusion is the following:

> Parents have the responsibility to make decisions and perform other parental functions necessary for the care and growth of their minor children. *In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities.* The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. *The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.*

(Italics ours.) RCW 26.09.002.

---

[12]*In re Marriage of Kovacs*, 67 Wn. App. 727, 731, 840 P.2d 214 (1992).

[13]*Kovacs*, 67 Wn. App. at 731. The case presently before the court involves the *initial* permanent placement decision *not* a modification of placement, which would be governed by RCW 26.09.260.

[14]*Kovacs*, 67 Wn. App. at 730-31.

That policy section, however, must be read in conjunction with the following placement provisions:

(1) OBJECTIVES. The objectives of the permanent parenting plan are to:

(a) Provide for the child's physical care;

(b) Maintain the child's emotional stability;

(c) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for future modifications to the permanent parenting plan;

(d) Set forth the authority and responsibilities of each parent with respect to the child, consistent with the criteria in RCW 26.09.187 and 26.09.191;

(e) Minimize the child's exposure to harmful parental conflict;

(f) Encourage the parents, where appropriate under RCW 26.09.187 and 26.09.191, to meet their responsibilities to their minor children through agreements in the permanent parenting plan, rather than by relying on judicial intervention; and

(g) To otherwise protect the best interests of the child consistent with RCW 26.09.002.

RCW 26.09.184(1).

(3) RESIDENTIAL PROVISIONS.

(a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(i) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Factor (i) shall be given the greatest weight.

RCW 26.09.187(3)(a).[15]

■ In interpreting the above statutory language certain principles of statutory construction apply. These are as follows: (1) a statute which is clear on its face is not subject to judicial interpretation; (2) an ambiguity will be deemed to exist if the statute is subject to more than one reasonable interpretation; (3) if a statute is subject to interpretation, it will be construed in the manner that best fulfills the legislative purpose and intent; and (4) in determining the legislative purpose and intent the court may look beyond the language of the Act to legislative history.[16]

On its face, the language of the Parenting Act may be interpreted as requiring placement with the primary caregiving parent, absent a showing of harm to the child, or it may be interpreted as allowing a trial court to weigh all factors and then place the child with the parent the trial court believes will best meet the needs of the child, whether or not that parent has been the primary caregiver. Because it is subject to more than one reasonable interpretation, the Parenting Act is subject to judicial construction.[17]

The Act's history actually began several years before it was proposed to the Legislature. During the early 1980's the Legislature considered several bills that would have amended the custody provisions of the marriage dissolution act.[18] Many of these bills were "joint custody" bills which would have created a presumption for shared or split parenting of children after dissolution of marriage.[19] Following the 1983

---

[15]Factor (vii) was added by the Laws of 1989, ch. 375, § 10.

[16]*Biggs v. Vail*, 119 Wn.2d 129, 134, 830 P.2d 350 (1992); *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 184-85, 829 P.2d 1061 (1992).

[17]*Kadoranian*, 119 Wn.2d at 185.

[18]RCW 26.09.

[19]1987 Proposed Parenting Act Commentary and Text, at 10 (available at Wash. State Archives); Ellis, *Plans, Protections, and Professional Intervention:*

legislative session, an ad hoc committee, which included lawyers, state legislators, family law professors, child psychiatrists and psychologists, began working on a compromise draft that eventually became the Parenting Act of 1987.[20] The ad hoc committee included advocates of a shared parenting (joint custody) presumption as well as advocates of a primary caregiver presumption.[21]

The ad hoc committee's first proposed draft was introduced in bill form to the Legislature in 1986.[22] The policy section of the proposed bill differed from that eventually enacted in 1987 in that it stated:

> *It is presumed* that the best interest of the child is served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

(Italics ours.) House Bill 1618, § 1, 49th Legislature (1986) (part).

The bill further included a presumption to be applied by a trial court when designating primary residential placement of a child. The bill stated that the trial court was to first determine whether there was a primary caregiver for the child. If so, then "[i]t is presumed that the child's best interests are served by awarding the child's residence to the primary caregiver". House Bill 1618, § 8(4)(a), 49th Legislature (1986) (part). The proposed presumption section was weakened somewhat during the 1986 legislative session.[23] However, the bill did not pass at that session.

The following year, the committee's 1987 draft, House Bill 48, was introduced by Representative Marlin Appelwick (a

---

*Innovations in Divorce Custody Reform and the Role of Legal Professionals*, 24 U. Mich. J.L. Ref. 65, 75 (1990-1991) (hereinafter Ellis).

[20]Commentary, at 9-11.

[21]Ellis, at 76 n.29.

[22]Commentary, at 11.

[23]*See* Substitute House Bill 1618, § 17(4)(a), (b), 49th Legislature (1986).

member of the ad hoc drafting committee) and other legislators. Initially, the bill required preferential treatment of the primary caregiver when the trial court determined primary residential placement of the child. Section 9 of the bill set forth certain criteria that were assigned sequential priority.[24] The first criterion limited the involvement of a parent whose conduct had been harmful to the child. If no limitation was imposed, then the second criterion was examined to determine whether the parents agreed to the residential placement of the child. If neither of the first two criteria were met, then the court would continue to the third criterion. "This third criterion *favors* the parent who has taken greater responsibility for the routine parenting functions . . . Only if the preceding criteria do not resolve the issue is a fourth criterion to be used." (Italics ours.)[25]

The above language was revised in *Substitute* House Bill 48 which replaced the primary caregiver presumption with the language now contained in RCW 26.09.187(3)(a)(i)-(vi). The first factor of this subsection is to be given the greatest weight by the trial court. RCW 26.09.187(3)(a). That factor is:

> The relative strength, nature, and stability of the child's relationship with each parent, *including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child*[.]

(Italics ours.) RCW 26.09.187(3)(a)(i).

During a hearing on Substitute House Bill 48 before the Senate Judiciary Committee, this section of the bill was criticized by fathers' rights and shared parenting advocates.[26] To explain this section, a drafter and sponsor of the bill, Representative Appelwick, wrote to the Senate Judiciary Committee:[27]

---

[24] House Bill 48, § 9, 50th Legislature (1987); Commentary, at 27.

[25] Commentary, at 27.

[26] Legislative staff tape recording of hearings before the Senate Judiciary Committee (Mar. 25, 1987).

[27] Letter from Representative Marlin Appelwick to Senator Phil Talmadge, Chairman, and Members of Senate Judiciary Committee (part) (Mar. 25, 1987). This letter written to the Senate committee considering this bill is a part of the legislative record and is available at Wash. State Archives.

I would like to address three issues raised at today's hearing on SHB 48:

1. *The role of parenting functions in the residential schedule* —

In the bill in front of the committee, six factors must be considered in establishing a residential schedule for the child. The schedule must "encourage each parent to maintain a loving, stable, consistent, and nurturing relationship with the child." Of the factors considered, the most important factor is "the relative strength, nature and stability of the child's relationship with each parent." This factor is a tremendously complex factor. One of the many components of this factor is "whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child." *This component is listed so that the court not overlook it.* Many components could have been listed. This one was politically important to list. The previous year's legislation did have a tie-breaker presumption in favor of a parent who performed more parenting functions relating to the daily needs of the child. This bill abandons that presumption in favor of the six factors. *We did not want to imply by reversing that position that we did not want the court to consider this component,* so this is important as clarification.

Other testimony at the hearing included that of an attorney representing the Family Law sections of the Washington State and Seattle-King County Bar Associations. These Family Law sections withdrew prior opposition to the Parenting Act, stating that the *removal* of the primary caregiver presumption contained in previous drafts had enabled them to support Substitute House Bill 48.[28]

██ While the statements of individual lawmakers and others before the Senate Judiciary Committee cannot be used to conclusively establish the intent of the Legislature as a whole,[29] they can be instructive in showing the reasons for the changes in the legislation.[30] This is particularly true where, as here, the legislative record does not reflect any

---

[28]Legislative staff tape recording of hearings before the Senate Judiciary Committee (Mar. 25, 1987).

[29]*In re F.D. Processing, Inc.*, 119 Wn.2d 452, 461, 832 P.2d 1303 (1992); *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 63, 821 P.2d 18 (1991).

[30]*Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 49, 785 P.2d 815 (1990).

contrary intent. Furthermore, the remarks of Representative Appelwick, a prime sponsor and drafter of the bill, are appropriately considered to determine the purpose of revisions to the language of the proposed act.[31]

The law as enacted also changed the policy section proposed by the drafters by replacing the language creating a presumption to a statement that the best interests of a child are "*ordinarily* served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm." (Italics ours.) RCW 26.09.002 (part).

Marcia Kovacs, the mother in the case before the court, argues that this language "allows alteration of the existing parental relationship only as required to protect the children from physical, mental, or emotional harm."[32] However, where physical, mental or emotional harm to the child are at issue, the limitations provided for in RCW 26.09.191(2) or (3) would apply. The mother essentially argues that the law presumes that placement with the primary caregiver is in the child's best interests and that the presumption can only be overcome by a showing of harm to the child. This argued interpretation of the law is clearly contrary to the Legislature's intent.

Further evidence of the Legislature's intent is demonstrated by its concern that the parent who had been awarded temporary residential placement of the child *not* be given unfair advantage when the permanent parenting plan was entered. RCW 26.09.197 requires a trial court awarding temporary residential placement to "give particular consideration" to (1) which parent has taken greater responsibility during the last 12 months for performing parenting functions relating to the daily needs of the child and (2) which

---

[31]*Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal*, 39 Wn. App. 609, 619-20, 694 P.2d 697 (1985).

[32]Supplemental Brief of Respondent, at 15.

parenting arrangements will cause the least disruption to the child's emotional stability while the action is pending, as well as to the seven factors listed in RCW 26.09.187(3)(a). In enacting these temporary parenting plan provisions, the Legislature recognized "the importance to the child's emotional stability of maintaining established patterns of care during what is generally a highly chaotic and emotionally stressful time." 1987 Proposed Parenting Act Commentary and Text, at 18 (available at Wash. State Archives). These same two considerations are not among the factors to be considered when developing the residential provisions of a *permanent* parenting plan.

The Act further states:

> In entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting plan.

RCW 26.09.191(4).

The *Family Law Deskbook*[33] explains:

> The temporary parenting plan is to be based upon a look at the *preceding 12 months* to determine the relationship of the children with each parent subject, of course, to the other limitations. In the permanent parenting plan, the court is to evaluate the ability of each parent to perform the parenting functions for each child *prospectively*. Drawing any presumption from the temporary plan is inappropriate.

(Italics ours.) Washington State Bar Ass'n, *Family Law Deskbook* 45-25 (1989).

It is thus clear to us from the legislative history that the Legislature not only did not intend to create any presumption in favor of the primary caregiver but, to the contrary, intended to reject any such presumption.

In establishing the seven statutory factors set forth in RCW 26.09.187(3)(a), the Legislature has provided the trial court guidance, along with the flexibility it needs, to make these difficult decisions.

---

[33]The *Family Law Deskbook*'s chapter on the Parenting Act was authored by attorneys Mary H. Wechsler and Marlin J. Appelwick.

On appeal, the mother in this case initially also challenged the trial court's findings of fact relating to the stability of each parent and the trial court's conclusion that the evidence supported placement of the children with the father. An appellate court may not substitute its findings for those of the trial court where there is ample evidence in the record to support the trial court's determination.[34] While the evidence in this case is contradictory, there is ample evidence to support the trial judge's findings of fact.

The record reflects that the decision of the trial court in this case was based on a consideration of the statutory factors set forth in RCW 26.09.187(3)(a), and on the evidence presented, including testimony of expert witnesses. On the record presented, we cannot conclude that the trial court's decision was based on untenable grounds or that it was manifestly unreasonable. We hold, therefore, that the trial court did not abuse its discretion in awarding residential placement of the children to the father.[35]

The Court of Appeals is reversed and the parenting plan ordered by the trial court is affirmed.

UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

---

[34]*Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959).

[35]*In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983).