Honorable Michael J. Murphy State Treasurer P.O. Box 40200 Olympia, WA 98540-0200
Honorable Brian Sonntag Washington State Auditor P.O. Box 40021 Olympia, WA 98504-0021
Dear Treasurer Murphy and Auditor Sonntag:
By letter previously acknowledged, you have requested our opinion on the following paraphrased questions:
 1. Does RCW 36.102.060(8) require the master tenant lease for the football stadium (constructed pursuant to the Stadium and Exhibition Center Financing Act, Laws of 1997, ch. 220) to include a provision that the Seattle Seahawks football team must publicly disclose, on an annual basis, an audited profit and loss financial statement?
 2. If the answer to Question 1 is yes, and the master tenant lease does not contain such a provision, what remedies are available to require that the master tenant lease comply with RCW 36.102.060(8)?
 BRIEF ANSWER
The answer to your first question is no. RCW 36.102.060(8) does not require the master lease to contain a provision that requires the professional football team to provide an annual audited profit and loss statement. RCW 36.102.060(8) imposes this requirement on the team affiliate that is the sole master tenant. The phrase "sole master tenant" refers to a single entity.[original page 2] There can only be one sole master tenant, so the requirement to submit a profit and loss statement is not imposed on both the sole master tenant and the football team. Since the answer to your first question is no, it is not necessary to answer your second question.
 BACKGROUND 1. The Stadium And Exhibition Center Financing Act
In 1997, Football Northwest, Inc. (FNW) had an option to purchase the Seattle Seahawks football team from its owner who wanted to move the team to California. See Brower v. State,137 Wn.2d 44, 49, 969 P.2d 42 (1998). FNW indicated that it would not exercise this option unless a new football stadium was built. In response, the Legislature enacted the Stadium and Exhibition Center Financing Act, Laws of 1997, ch. 220, which provided for building the new stadium and exhibition center. Brower,137 Wn.2d at 49.
The act provided for the creation of a public stadium authority (PSA). RCW 36.102.020(1). The PSA had the authority to "acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a stadium and exhibition center". RCW 36.102.050(1). In carrying out these functions, the PSA was required to consult with the team affiliate about the site, scope, and design of the project. RCW 36.102.060(1)-(3). The PSA also was required to consult with the team affiliate about the budget for the project and make recommendations to the state finance committee about the structure of financing for the stadium. RCW 36.120.060(5)-(6). The term "team affiliate" was defined in the act to mean
 a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated by the team. An "affiliate of the team" means any person or entity that controls, is controlled by, or is under common control with the team.
RCW 36.102.010(10). The term "professional football team" was defined to mean a team that is a member of the national football league or similar professional football association.
RCW 36.102.010(5).
Although the PSA had the authority to build the stadium, it was authorized "to enter into a development agreement with a team affiliate whereby the team affiliate may control the development of the stadium and exhibition center project". RCW 36.102.060(7). Likewise, while the PSA was authorized to operate the stadium and exhibition center, it had the authority to
 enter into a long-term lease agreement with a team affiliate whereby, in consideration of the payment of fair rent and assumption of operating and maintenance responsibilities, risk, legal liability, and costs associated with the stadium and exhibition center, the team affiliate becomes the sole master tenant of the stadium and exhibition center.
RCW 36.102.060(8).
[original page 3] RCW 36.102.060(8) also provided that the "master tenant lease agreement must require the team affiliate to publicly disclose, on an annual basis, an audited profit and loss financial statement." The Legislature also required the team affiliate to "provide a guarantee, security, or a letter of credit from a person or entity with a net worth in excess of one hundred million dollars that guarantees a maximum of ten years' payments of fair rent under the lease in the event of the bankruptcy or insolvency of the team affiliate." RCW36.102.060(8).
Although the PSA had the authority to negotiate the master lease agreement, the Legislature created a stadium authority advisory committee to "review and comment on the proposed lease". RCW 36.102.040(2). The committee was made up of the "director of the office of financial management . . . two members appointed by the house of representatives, one each appointed by the speaker of the house of representatives and the minority leader of the house of representatives; and two members appointed by the senate, one each appointed by the majority leader of the senate and the minority leader of the senate." RCW 36.102.040(1). The committee's review was to take place "prior to the final approval of any lease". RCW 36.102.040(2).
The stadium was to be financed through the sale of bonds. Laws of 1997, ch. 220, § 210(1). Before bonds could be sold, the PSA was required to certify to the director of the Office of Financial Management that a "professional football team has made a binding and legally enforceable contractual commitment to play all of its regular season and playoff home games in the stadium". Laws of 1997, ch. 220, § 210(2)(a).
The PSA also had to certify that a "team affiliate has entered into one or more binding and legally enforceable contractual commitments with a public stadium authority". Laws of 1997, ch. 220, § 210(2)(b). Some of these were financial commitments that the team affiliate would assume "the risks of cost overruns", "raise at least one hundred million dollars" to be used for the project, and "deposit at least ten million dollars into the youth athletic facility grant account". Laws of 1997, ch. 220, § 210(2)(b)(i)-(iii). Another financial commitment was that the state be granted a "nonparticipatory interest in the professional football team" that entitles "the state to receive ten percent of the gross selling price" if the team is sold under certain circumstances. Laws of 1997, ch. 220, § 210(2)(b)(vi). The team affiliate also was required to make a commitment to work with the "surrounding areas to mitigate the impact of the construction and operation of the stadium . . . with a budget of at least ten million dollars dedicated to area mitigation." Laws of 1997, ch. 220, § 210(2)(b)(viii). The Legislature also required a commitment that "[t]wenty percent of the net profit from the operation of the exhibition facility of the stadium and exhibition center" be "deposited into the permanent common school fund." Laws of 1997, ch. 220, § 210(2)(b)(ix).
There also were commitments regarding the operation of the stadium. "At least ten percent of the seats in the stadium for home games of the professional football team" had to be sold "at an affordable price" and "[o]ne executive suite with a minimum of twenty seats" had to be made "available, on a lottery basis, as a free upgrade, at home games of the professional football team" to ticket purchasers. Laws of 1997, ch. 220, § 210(2)(b)(iv)-(v). The team [original page 4] affiliate also was required to provide the PSA with reasonable office space without charge. Laws of 1997, ch. 220, § 210(2)(b)(vii).
The act did not go into effect immediately. The Legislature referred sections 101 through 604 to the people for a vote as Referendum Bill 48. RCW 36.102.803(1). The Legislature also provided that the act "shall be null and void in its entirety unless the team affiliate as defined in [section 101 of this act] enters into an agreement with the secretary of state to reimburse the state and the counties for the full cost of the special election" to be held on Referendum Bill 48. RCW 36.102.802. Referendum Bill 48 was subsequently approved by the people.
2. The Master Tenant Lease Agreement
After Referendum Bill 48 was approved, the PSA entered into a master lease agreement with First Goal, Inc. (FGI). According to the agreement:
 Football Northwest LLC ("FNW") owns the National Football League team, the Seattle Seahawks ("Team"). FNW is under the control of Paul G. Allen ("Allen"). FGI is a corporation also under the control of Allen. Accordingly, FGI is a "team affiliate," as that term is defined in Section 101(1) of the Act, because FGI and the Seattle Seahawks are under common control.
Master Lease ¶ H, at 2 (Nov. 24, 1998).
Your questions pertain to the requirement in RCW 36.102.060(8) that the master lease agreement must contain a provision requiring disclosure of an annual profit and loss statement. This provision is contained in paragraph 8.9 of the master lease, which states:
 FGI shall submit to PSA for public disclosure not later than one hundred eighty (180) days following the end of each Lease Year an audited profit and loss financial statement for FGI's operations of the Project. This statement shall be certified as accurate by the chief financial officer of FGI and shall be accompanied by a certificate of an independent certified public accountant reasonably satisfactory to PSA that such statement has been prepared in accordance with GAAP, except as so noted, and accurately states the profits and losses of FGI for the period of such statement. The format and detail of the statement of profits and losses shall be subject to the approval of PSA.
Master Lease ¶ 8.9, at 29 (Nov. 24, 1998). Paragraph 8.9 requires the master tenant, FGI, to provide an audited profit and loss statement. However, it does not require an audited profit and loss statement from FNW with regard to the operation of the Seattle Seahawks football team.
3. The February 11, 2003, Letter
Your first question is whether RCW 36.102.060(8) requires the master lease to provide that the football team submit a profit and loss statement. Deputy Attorney General David Walsh[original page 5] previously advised on this question in a letter dated February 11, 2003, to the state treasurer. The letter was not a formal Attorney General Opinion and represented Mr. Walsh's own legal conclusions.
The February 11, 2003, letter advised that the master lease agreement must include a provision requiring the football team to disclose an annual profit and loss statement. The letter pointed to the text of RCW 36.102.060(8), which provides that the "master tenant lease agreement must require the team affiliate to publicly disclose, on an annual basis, an audited profit and loss financial statement". (Emphasis added.) Under RCW 36.102.060(8), the profit and loss statement was required from the team affiliate. The letter then reviewed the definition of "team affiliate" in the act, which means
 a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated by the team. An "affiliate of the team" means any person or entity that controls, is controlled by, or is under common control with the team.
RCW 36.102.010(10) (emphasis added).
The letter applied the principle of statutory construction that if a statute is clear on its face, it is not subject to judicial interpretation. The letter reasoned that the master lease must require the football team to submit a profit and loss statement because, under the plain language of the statute, the term "team affiliate" includes both the football team and any affiliate of the team. You have now jointly requested an official opinion whether RCW 36.120.060(8) requires the master lease to provide that the football team submit a profit and loss statement.
 ANALYSIS 1. Does RCW 36.102.060(8) require the master tenant lease forthe football stadium (constructed pursuant to the Stadium andExhibition Center Financing Act, Laws of 1997, ch. 220) toinclude a provision that the Seattle Seahawks football team mustpublicly disclose, on an annual basis, an audited profit and lossfinancial statement?
The Stadium and Exhibition Center Financing Act is a complex law requiring that a number of specific actions be undertaken. Frequently, the act uses the term "team affiliate" to describe the entity that must take certain actions. The act also specifies that actions be taken by the professional football team and the master tenant. Moreover, when the Legislature passed the act, there was no professional football team or team affiliate. FNW simply had an option to buy the Seattle Seahawks. Your question is a close one, and reasonable minds may disagree about the answer. However, after reviewing (1) the law; (2) the February 11, 2003, letter; and (3) various documents such as the master lease, we conclude that the answer to your first question is no — RCW 36.102.060(8) does not require that the master lease agreement contain a provision that the professional football team, FNW, must provide the PSA with an annual profit and loss statement.
[original page 6] We begin with basic principles of statutory construction. "In construing a statute, the court's objective is to determine the Legislature's intent. If the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." State v.Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). "The `plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue, as well as from the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." Id. A statute is ambiguous if it is "subject to more than one reasonable interpretation". In re Marriage of Kovacs, 121 Wn.2d 795, 804,854 P.2d 629 (1993). If a "statute is subject to interpretation, it will be construed in the manner that best fulfills the legislative purpose and intent". Id. However, an "interpretation that produces `absurd consequences' must be rejected, since such results would belie legislative intent."Troxell v. Rainier Pub. Sch. Dist. 307, 154 Wn.2d 345, 350,111 P.3d 1173 (2005). Also, in interpreting a statute, "administrative construction nearly contemporaneous with the passage of the statute, especially when the Legislature fails to repudiate the contemporaneous construction, is entitled to great weight." Green River Cmty. Coll., Dist. 10 v. Higher Ed. Pers.Bd., 95 Wn.2d 108, 118, 622 P.2d 826 (1980). Finally, a review of legislative history "is appropriate where legislative intent is not apparent from the language of a statute." State v.Komok, 113 Wn.2d 810, 815, 783 P.2d 1061 (1989).
RCW 36.102.060(8) provides that the "master tenant lease agreement must require the team affiliate to publicly disclose, on an annual basis, an audited profit and loss financial statement." (Emphasis added.) The February 11 letter focused its analysis on the meaning of the word "and" in the definition of "team affiliate" in RCW 36.102.010(10). "Statutory phrases separated by the word `and' generally should be construed in the conjunctive." HJS Dev., Inc. v. Pierce Cy. ex rel. Dep't ofPlanning Land Servs., 148 Wn.2d 451, 474, 61 P.3d 1141 (2003). However, in "certain circumstances, the conjunctive `and' and the disjunctive `or' may be substituted for each other if it is clear from the plain language of the statute that it is appropriate to do so." Bullseye Distrib. LLC v. State Gambling Comm'n,127 Wn. App. 231, 239, 110 P.3d 1162 (2005). The February 11 letter concluded that the term "and" in the definition of "team affiliate" was conjunctive. Since the definition of "team affiliate" included the football team, FNW, and the team affiliate, FGI, the February 11 letter concluded that the requirement that the team affiliate provide a profit and loss statement applied to both FNW and FGI.
In our view, the February 11 letter focused on the wrong issue. The question is not whether the word "and" in the definition of "team affiliate" is conjunctive. Even assuming "and" is conjunctive, the issue is to what entity does the term "team affiliate" refer in RCW 36.102.060(8), which imposes the requirement to provide a profit and loss statement. "Under the `plain meaning' rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained." City of Seattle v. Allison, 148 Wn.2d 75,81, 59 P.3d 85 (2002). A "single word in a statute should not be read in isolation, and . . . the meaning of words may be indicated or controlled by those with which they are associated."State v. Roggenkamp, 153 Wn.2d 614, 623, 106 P.3d 196 (2005). Context is important. For example, consider the following two sentences:
 [original page 7] The term fruit means apples and oranges. At lunch every child may take a piece of fruit.
The first sentence defines fruit as apples and oranges. But the use of the term "fruit" in the second sentence does not mean that a child may take both an apple and an orange at lunch; the child may only take a piece of fruit — either an apple or an orange. The use of the phrase "a piece of fruit" makes that term singular in the second sentence, even though it is plural in the first sentence. The meaning of a word in a sentence always depends on the context in which it is used.
Similarly, the context of RCW 36.102.060(8) suggests the conclusion that the term "team affiliate" is singular — it refers to just one entity. It does not include both the football team and the team affiliate. RCW 36.102.060(8) provides that:
 The public stadium authority shall have the authority to enter into a long-term lease agreement with a team affiliate whereby, in consideration of the payment of fair rent and assumption of operating and maintenance responsibilities, risk, legal liability, and costs associated with the stadium and exhibition center, the team affiliate becomes the sole master tenant of the stadium and exhibition center. The master tenant lease agreement must require the team affiliate to publicly disclose, on an annual basis, an audited profit and loss financial statement.
(Emphasis added.)
RCW 36.102.060(8) grants the PSA authority to enter into a long-term lease agreement with a team affiliate who becomes "the sole master tenant". The use of the article "a" and the phrase "the sole master tenant", like the phrase "a piece of fruit" in the example above, require that "team affiliate" be construed to refer to a single entity.
This statute authorizes the PSA to deal with a single team affiliate that will be the sole master tenant. It does not require the PSA to enter into a lease agreement with both the football team and the team affiliate. If it did so, there would be two master tenants instead of a sole master tenant. The team affiliate required to submit the profit and loss statement refers back to the team affiliate that becomes the sole master tenant — in this case, that is FGI.
In our judgment, the plain meaning of the term "team affiliate" in RCW 36.102.060(8) is singular. The team affiliate is the sole master tenant and does not include both FGI and the football team, FNW. This conclusion is buttressed by the rules of statutory interpretation. At a minimum, the singular term "sole master tenant" in RCW 36.102.060(8) and the definition of "team affiliate" in RCW 36.102.010(10) make the statute ambiguous and subject to interpretation.
[original page 8] One rule of statutory construction is that courts construe a statute so as to avoid strained consequences that could result from a literal reading. Reading the term "team affiliate" in RCW 36.102.060(8) broadly, to include all team affiliates, would lead to strained consequences, because FNW and FGI are not the only entities that are team affiliates. RCW36.102.010(10) defines "team affiliate" to mean
 a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated by the team. An "affiliate of the team" means any person or entity that controls,
is controlled by, or is under common control with the team.
(Emphasis added.) Under this definition, Paul Allen is also a team affiliate. An affiliate of the team also includes "any person . . . that controls . . . the team." As an "affiliate of the team", Mr. Allen also appears to be a "team affiliate". Both the PSA and the State Finance Committee recognize Mr. Allen as a team affiliate. Under the act, no bonds could be issued until the team affiliate entered into one or more "binding and legally enforceable contractual commitments with a public stadium authority". Laws of 1997, ch. 220, § 210(2)(b). The PSA was required to certify to the director of the Office of Financial Management that these agreements were in place. That certification provided:
 First Goal, Inc., a Washington corporation, ("FGI"), Football Northwest LLC, a Washington limited liability company ("FNW"), Football Northwest Management Inc., a Washington corporation (FNM"), and Paul G. Allen ("Allen"), are each "team affiliates" contemplated by the Stadium Act, and FNW is a "professional football team" contemplated by the Stadium Act.
Certificate of Washington State Public Stadium Authority Pursuant to Section 210(2), ch. 220, Laws of 1997, ¶ 6 (emphasis added).
Similarly, State Finance Committee Resolution 881, which authorized the sale of bonds to build the stadium and exhibition center, provided:
 "Team Affiliate" means each of First Goal, Inc., a Washington corporation, Football Northwest LLC, a Washington limited liability company, Football Northwest Management Inc., a Washington corporation and Paul G. Allen.
State Fin. Comm. Res. 881, § 1, at 5 (Dec. 18, 1998) (emphasis added).
Reading the requirement to provide a profit and loss statement to apply to all team affiliates would mean that Paul Allen would be required to meet this requirement. In our judgment, it would be strained to conclude that the Legislature intended Paul Allen "to publicly disclose, on an annual basis, an audited profit and loss financial statement." RCW 36.102.060(8). This strained consequence is avoided by reading the term "team affiliate" in RCW 36.102.060(8) as a singular term that applies to FGI, the sole master tenant.
[original page 9] Courts also look to the structure of a statute and related statutes in determining its meaning. The structure of the act supports the conclusion that the term "team affiliate", either in the context of defining the sole master tenant or for purpose of the terms of the lease, was not intended to be a collective term. The act required the team affiliate to enter into a number of legally binding agreements before bonds could be sold. Laws of 1997, ch. 220, § 210(2)(b). Nothing in the act supports the conclusion that all the entities that met the definition of "team affiliate" — FGI, FNW, and Mr. Allen — must each enter into all of the binding agreements. Rather, the term "team affiliate" is a flexible term that allows different entities to enter into the various agreements required by the act.[1]
The February 11, 2003, letter reasoned that these legally binding agreements were the obligation of the football team, so it was logical that the football team was subject to the requirement to disclose a profit and loss statement. However, there is another interpretation that, upon reflection, is more persuasive. Many were the obligations of Paul Allen. Certainly it was expected that Mr. Allen would supply the money to meet the various financial obligations required by the act and, since Mr. Allen owns FNW and FNW owns the Seattle Seahawks, it was necessary for Mr. Allen to sign the Sales Proceeds Sharing Agreement, which granted the state a nonparticipatory interest in the football team. Similarly, the football team could not be responsible for the requirement in RCW 36.102.802 that the team affiliate agree to reimburse the state and the counties for the cost of the special election. If the voters had rejected Referendum Bill 48, FNW would not have exercised its option, and there would have been no football team to pay for the election.
Courts also look to the purpose of the law in interpreting a statute. The purpose of the requirement for a profit and loss statement also supports the conclusion that it is imposed on the team affiliate that is the master tenant. The February 11 letter reasoned that the profit and loss statement was a team obligation, because there was a significant level of public interest in the policy issue concerning the need for the public to finance the stadium. However, realistically, this could not have been the purpose of the requirement, because the Legislature would have passed the act and the voters would have approved Referendum Bill 48 before the team affiliate was required to submit the profit and loss statement. At this point, it would be too late to conclude that the football team was profitable and no public financing for the stadium was necessary. Nor does the state have any direct interest in the profitability of the team. When the [original page 10] Legislature authorized building a new baseball stadium, one of the obligations of the team was to
 [s]hare a portion of the profits generated by the baseball team from the operation of the professional franchise for a period of time equal to the term of the bonds issued to finance the initial construction of the stadium, after offsetting any losses incurred by the baseball team after the effective date of chapter 14, Laws of 1995 1st sp. sess. Such profits and the portion to be shared shall be defined by agreement between the public facilities district and the baseball team. The shared profits shall be used to retire the bonds issued to finance the initial construction of the stadium. If the bonds are retired before the expiration of their term, the shared profits shall be paid to the public facilities district.
RCW 82.14.360(4)(c) (emphasis added).
Similar to the baseball stadium legislation, the football stadium act requires that "[t]wenty percent of the net profit from the operation of the exhibition facility of the stadium and exhibition center" be "deposited into the permanent common school fund". Laws of 1997, ch. 220, § 210(2)(b)(ix). The state has an interest in the profitability of the sole master tenant since the state will share in the profit from the operation of the exhibition center. Requiring an audited profit and loss statement from the sole master tenant serves the purpose of ensuring that the common school fund receives the money to which it is entitled. The same is not true of a team affiliate that is not the master tenant. There is no similar provision in the act granting the state a share of the profits from the operation of the football team. Instead, the state was granted a nonparticipatory interest, so it would receive 10 percent of the selling price of the team if it were sold under certain circumstances. Laws of 1997, ch. 220, § 210(2)(b)(vi). Thus, we find no purpose expressed in the act that would be served by a profit and loss statement from the football team.
The contemporaneous construction of the requirement by the PSA also supports our conclusion. The PSA was charged with the responsibility of entering into agreements with the team affiliate. When the PSA negotiated the master lease, it only required FGI to disclose a profit and loss statement. Its contemporaneous construction of the act is entitled to some weight in interpreting the law. We also note that RCW36.102.040(2) required the public stadium authority advisory committee to review and comment on the lease prior to final approval. To the best of our knowledge, the advisory committee raised no question about the fact that the master lease did not require the football team to disclose a profit and loss statement.
The February 11 letter reviewed the legislative history of the act and concluded that it was not helpful in interpreting the statute. We agree with that conclusion. The requirement that the team affiliate disclose a profit and loss statement was added to the act as floor amendment number 737, in the House of Representatives, by Representative Jim Clements. The February 11 letter notes that the paper copy of amendment 737 states: "Effect: Requires the football team to annually disclose a profit and loss financial statement." Amendment 737 to Substitute HB 2192, 55th Leg., Reg. Sess. (Wash. 1997) (Emphasis added.) This would support the interpretation that [original page 11]
FNW must disclose a profit and loss statement. However, when Representative Clements spoke in favor of his amendment, he stated:
 This amendment basically is business is business. There has to be disclosed a profit and loss statement regarding this venture in the master tenant. I would urge the body to support it.
House Floor Debate, Substitute House Bill (SHB) 2192, April 25, 1997, found at http://www.tvw.org/search/siteSearch.cfm?keywords= House%20FloorDate=1997CFID=6341656CFTOKEN=80598636 (visited Mar. 13, 2006) (emphasis added).
This statement supports our interpretation that the obligation to submit a profit and loss statement falls on the sole master tenant. In light of the contradictory nature of these statements, we conclude that the legislative history of the act is not helpful in interpreting RCW 36.102.060(8).
As we observed at the outset of our analysis, this is a close question upon which reasonable minds can disagree. However, we are persuaded that the better reading of RCW 36.102.060(8) is that it does not require the master lease agreement to contain a provision that the football team, FNW, must submit an audited profit and loss financial statement. This reading comports with the plain meaning of the language and is consistent with the structure of the act. It does not result in strained consequences, and it is consistent with the actions taken by the PSA and FGI in negotiating the master lease in 1998.
2. If the answer to Question 1 is yes, and the master tenantlease does not contain such a provision, what remedies areavailable to require that the master tenant lease comply with RCW36.102.060(8)?
Since the answer to your first question was no, it is not necessary to answer your second question.
We trust that this opinion will be of assistance to you.
Sincerely,
 ROB MCKENNA Attorney General
 WILLIAM B. COLLINS Deputy Solicitor General
:pmd
[1] A somewhat different, but related, way to approach this issue of statutory interpretation would be to focus on the provision in the statutory definition of "team affiliate" that expressly authorizes the football team to designate which entity (or entities) among those within the definition of "affiliate of the team" is a "team affiliate." The term is defined as "a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated bythe team." RCW 36.102.010(10). Although this language is somewhat circular, it is logical to read it as allowing the football team to decide, among other things, whether the team itself or a "team affiliate" will enter into the master lease, and to designate which "team affiliate" (if there are more than one) will sign the lease. Though the certification by the PSA and bond resolution of the State Finance Committee described above referred to FNW and Paul Allen as "team affiliates," we understand that ultimately, FNW designated FGI to be the "team affiliate" for purposes of the lease.