# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | ) |
| | ) No. 73439-3-I |
| JILL S. CALABRESE, | ) |
| | ) DIVISION ONE |
| Appellant, | ) |
| | ) UNPUBLISHED OPINION |
| and | ) |
| | ) |
| JACK A. CALABRESE, | ) |
| | ) |
| Respondent. | ) FILED: March 7, 2016 |

2016 MAR -7 AM 9:39 COURT OF APPEALS DIV I STATE OF WASHINGTON FILED

TRICKEY, J. — Jill Calabrese appeals a trial court order granting her former husband's petition for modification of spousal maintenance. She contends Jack Calabrese's reduction of income was voluntary and not taken in good faith. Because substantial evidence supports the court's finding that the reduction in income was involuntary and constitutes a substantial change in circumstances justifying modification, we affirm.

## FACTS

In 2010, Jill and Jack Calabrese[1] divorced after 27 years of marriage. Under their settlement agreement, Jill received just over 54 percent of the net community assets, which totaled approximately $3 million. The agreement also required Jack to pay Jill $10,000 a month in spousal maintenance. The decree provided that this maintenance would continue for approximately eight years, until Jack turned 65. And if Jack's income remained at its current level of $300,000 annually, maintenance would continue for one additional year.

---

[1] For clarity, we refer to the parties by their first names.

At the time of the divorce, Jack had operated his own business, NAPA Insurance Center (NIC), for many years. As the endorsed provider of insurance for NAPA Auto Parts, NIC markets business insurance programs to NAPA stores nationwide. Because the sole focus of NIC is marketing insurance to NAPA stores, the corporate leadership of NAPA Auto Parts has allowed NIC to use the NAPA branding and logo. However, NIC has never had an ownership interest in or contractual relationship with any NAPA stores or NAPA corporate management. NIC functions as a "middleman" between NAPA stores and the insurance companies that sell policies to the NAPA dealers. NIC generates income from the commissions it receives from the insurance companies.

From 1991 to 2012, Federated Insurance was the only provider of business insurance that NIC marketed to NAPA dealers. Over 90 percent of NIC's income from commissions came from Federated. For many years, this was a consistently lucrative arrangement; at the time of the divorce, Jack's income exceeded $25,000 a month.

At some point, Federated began losing NAPA policyholders because its rates were no longer competitive. Around June 2011, NAPA corporate management met with Jack and Federated representatives to discuss ways to improve NAPA participation in Federated programs. After "many weeks of no improvements on the program," NAPA authorized Jack to "go a different direction."[2] In September 2012, NAPA severed its relationship with Federated, which stopped paying commissions to Jack.

---

[2] Clerk's Papers (CP) at 1805.

Jack's first attempt to replace Federated and secure a new source of income for NIC was an asset purchase agreement with a different provider, GMI, Inc. Under this agreement, Jack and GMI formed a new limited liability corporation, Newco, which would be known as NAPA Insurance Center, LLC. GMI owned 67 percent of this new entity, and Jack owned 33 percent. As part of the agreement, Jack also sold his goodwill in NIC to GMI for $800,000, to be paid in monthly installments over two years. Jack and GMI executed the contract as an asset purchase agreement in order for Jack to be able to declare capital gains, not ordinary income, and thus gain a tax benefit in 2012 and 2013. The agreement included an endorsement from NAPA. The agreement provided that after two years, Jack would receive an annual base salary of $200,000 plus a percentage of net profits. The parties projected that his annual income would be approximately $400,000 under these terms. NAPA reserved the right to terminate its relationship with GMI at any time.

The business plan with GMI was not successful. There was a low program adoption rate and NAPA corporate had received poor feedback from customers. GMI wanted to end the agreement to avoid further losses, and Jack wanted to maintain his relationship with NAPA. In October 2013, Jack agreed to pay GMI $200,000 to repurchase his membership interest and noncompetition agreement. He agreed to forgive the $100,000 GMI still owed him of the $800,000 in goodwill and to pay $100,000 in cash in two $50,000 installments.

In January 2014, Jack executed an agreement with Lockton Affinity, LLC. Under this agreement, Jack would receive a monthly fee of $10,000 during 2014,

3

along with a percentage of premiums over $1.8 million. After 2014, Jack would receive a percentage of collected premiums, but no monthly fee. The president of Lockton projected that Jack's income from commissions would total $24,948 for 2014, $89,892 for 2015, $60,984 for 2016, and $73,656 for 2017. During 2014, Jack used savings to compensate for the reduction in income and remained current in his maintenance payments to Jill.

On August 21, 2014, Jack filed a petition for modification of spousal support on the basis of a substantial change in circumstances, requesting that the court reduce his monthly maintenance payments to $2,000. Jack proposed that Jill also receive 30 percent of "net business revenue from NAPA Insurance Center," with payments not to exceed $120,000 a year.[3]

On January 9, 2015, following a contested hearing, the superior court commissioner entered findings of fact and conclusions of law and an order granting Jack's petition. The commissioner found that Jack's loss of income following NAPA's severance of its relationship with Federated constituted a substantial and involuntary change of circumstances. The commissioner found that the exclusive endorsement and business relationship with Federated "was expected to continue because it had been longstanding," but that Federated's loss of market share caused the end of the relationship and consequent reduction in Jack's income.[4]

The commissioner found that Jack's agreement with GMI, subsequent purchase of his noncompete, and his agreement with Lockton were "good faith

---

[3] CP at 4.
[4] CP at 1898.

4

efforts to maintain his income and to find a new insurance carrier for NAPA to endorse."[5] The commissioner noted that Jack paid his maintenance throughout 2012 and 2013 in part by means of his capital gains from the original agreement with GMI. And the commissioner found that Jack's 10 monthly bank deposits of $14,679.88 in 2014 included Lockton's guaranteed payment of $10,000 a month for that year, which would not continue in 2015.

The commissioner ordered that maintenance payments be reduced to $2,500, to begin in January 2015. In addition, the commissioner ordered Jack to pay 15 percent of all gross commission compensation above $100,000 a year. The commissioner ordered Jack to deposit all income to one bank account, with quarterly disclosures of bank statements.

Jill moved for revision of the commissioner's order. On March 20, 2015, the trial court adopted the commissioner's findings and conclusions, revising the order to include, "Should Mr. Calabrese's income be restored to historic levels to $300,000 annually, Ms. Calabrese may petition the court to reinstate the maintenance amounts and schedule in the Decree."[6]

Jill appeals.

## ANALYSIS

On a motion for revision, the superior court reviews the commissioner's findings of fact and conclusions of law de novo, examining only the evidence and issues before the commissioner. State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). Once the superior court rules on the revision motion, "the appeal is

---

[5] CP at 1898.
[6] CP at 1917-18.

5

from the superior court's decision, not the commissioner's." State v. Hoffman, 115 Wn. App. 91, 101, 60 P.3d 1261, rev'd on other grounds, 150 Wn.2d 536, 78 P.3d 1289 (2003).

Modification of spousal maintenance is appropriate where the moving party presents evidence establishing that there has been a substantial change in circumstances not within the parties' contemplation at the time the maintenance was ordered. RCW 26.09.170(1)(b); Wagner v. Wagner, 95 Wn.2d 94, 98, 621 P.2d 1279 (1980); In re Marriage of Ochsner, 47 Wn. App. 520, 524, 736 P.2d 292 (1987). A change in circumstances occurs upon a change in the financial ability of the obligor spouse to pay in comparison with the need of the other spouse. Ochsner, 47 Wn. App. at 524. A voluntary reduction in income will not constitute a change in circumstances warranting modification absent a "substantial showing of good faith." Lambert v. Lambert, 66 Wn.2d 503, 510, 403 P.2d 664 (1965).

We will not disturb the trial court's determination regarding substantial change in circumstances absent an abuse of discretion. Lambert, 66 Wn.2d at 508. A court abuses it discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. In re Marriage of Kovacs, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard." In re Marriage of Fiorito, 112 Wn. App. 657, 664, 50 P.3d 298 (2002). A decision is based on untenable grounds if "the factual findings are unsupported by the record; it is based on untenable reasons if it is

6

based on an incorrect standard or the facts do not meet the requirements of the correct standard." Fiorito, 112 Wn. App. at 664. Substantial evidence supports a factual determination if the record contains sufficient evidence to persuade a fair minded, rational person of the truth of that determination. Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986).

Jill argues that Jack's reduction in income was part of a retirement strategy. She analogizes to two cases, Fox v. Fox, 87 Wn. App. 782, 942 P.2d 1084 (1997), and Lambert v. Lambert, 66 Wn.2d 503, 403 P.2d 664 (1965), to argue that the reduction of income was voluntary and that Jack failed to carry his burden to show good faith. These cases do not support her argument.

In Fox, the husband, a surgeon, paid spousal support after his divorce from his wife of 37 years, who was disabled. 87 Wn. App. at 783. After the divorce, Fox sold his medical practice to a company whose registered agent was his new wife. Following the sale, the company hired Fox on a part-time basis and also hired his wife as the practice manager, at a substantial salary. Fox, 87 Wn. App. at 783-84. In affirming the trial court's rejection of the husband's petition for modification of spousal support, this court noted that while Fox's former wife's situation had worsened due to her increasingly debilitating multiple sclerosis, Fox had "suffered no significant reduction of the income to which he has access." Fox, 87 Wn. App. at 785-86. This court concluded, "Under the circumstances, it was reasonable for the trial court to conclude that [Fox's] reduction in individual income was part of a plan designed to create the appearance of a worsened financial condition, while at the same time ensuring

7

that his household income and lifestyle remained unchanged." Fox, 87 Wn. App. at 786.

Here, the record establishes that at the time of the divorce, the parties reasonably expected the lucrative relationship with Federated to continue. Following NAPA's severance of its relationship with Federated, Jack made voluntary decisions to sell his interest to GMI, repurchase his interest when the business plan did not succeed, and execute an agreement with Lockton. These decisions were efforts to secure a replacement for the relationship with Federated, which had accounted for 90 percent of Jack's income. Jack presented evidence supporting the trial court's finding that the loss of income from Federated was involuntary, resulting from decisions made not by Jack but by the corporate management of Federated and NAPA.

Jill argues that Jack, like the husband in Fox, voluntarily reduced his income in order to implement a retirement strategy. Jill points to a declaration in the record, in which Jack explained the sale of his goodwill in NIC to GMI investors: "At the time, it seemed like a good business proposition, as I am 61 and was trying to figure out a retirement strategy that would enable me to exit the business."[7] But this single general statement in one declaration does not support a finding that the sale to GMI was a voluntary retirement decision not made in good faith, analogous to Fox's plan "designed to create the appearance of a worsened financial condition." Fox, 87 Wn. App. at 786. The trial court rejected

---

[7] CP at 326.

8

this argument, as do we. Nor are we persuaded by Jill's arguments that Jack's lifestyle has "even improved" since the divorce.[8]

Lambert involved a husband whose optometry practice declined due to the notoriety surrounding his divorce proceedings. 66 Wn.2d at 505. While the divorce was pending, he began working as an employee at another optometry practice in a nearby city. Lambert, 66 Wn.2d at 505. After only one month of employment, however, the employer fired Lambert for not discontinuing his own optometry practice but essentially competing with his employer. Lambert, 66 Wn.2d at 505. Our Supreme Court noted that Lambert's employment "could have continued and probably prospered." Lambert, 66 Wn.2d at 505. But in his ill-fated efforts to revive his practice, Lambert incurred monthly expenses exceeding his employee salary and remained delinquent in his support obligations. Lambert, 66 Wn.2d at 505. The court held that such a "[v]oluntary reduction in income or self-imposed curtailment of earning capacity, absent a substantial showing of good faith, will not constitute such a change of circumstances as to warrant a modification." Lambert, 66 Wn.2d at 510.

Here, by contrast, the record shows no analogous voluntary reduction in income or self-imposed curtailment of employment. And unlike Lambert, Jack never became delinquent in his support obligations, despite his reduced income.

Similarly, In re Marriage of Bucklin, 70 Wn. App. 837, 855 P.2d 1197 (1993), which Jill cites to argue that insufficient evidence supports the trial court's findings, does not support her position. In Bucklin, the husband's evidence of his allegedly reduced income came only from his own testimony and handwritten

---

[8] Reply Br. of Appellant at 20.

notes. 70 Wn. App. at 839. He provided no independent records of his income, despite "protracted discovery attempts." Bucklin, 70 Wn. App. at 839. Division Three of this court concluded that the trial court "exercised its discretion in an untenable and manifestly unreasonable way by essentially guessing at his income. Without any clear idea of Mr. Bucklin's gross income, there was no way to determine whether his circumstances had substantially changed." Bucklin, 70 Wn. App. at 841.

Here, Jack provided tax returns, bank statements, deposit summaries, projections, interrogatory answers, business agreements including compensation clauses, and a declaration from NAPA corporate leadership. These documents support the court's finding of an involuntary reduction in income constituting a substantial change in circumstances.

Finally, Jill asserts that the trial court's remedy is inadequate, given that under the terms of the order on modification, monthly maintenance payments will not increase to $10,000 even if Jack's income reaches its former level of $300,000 a year. But the trial court revised the commissioner's order, providing that in the event Jack's income again reaches $300,000, Jill may petition the court to reinstate the maintenance levels of the original decree.

The trial court properly considered the change in circumstances of the obligor spouse relative to the necessities of the spouse receiving support and both parties' financial situations. See Ochsner, 47 Wn. App. at 524; Lambert, 66 Wn.2d at 508; In re Marriage of Glass, 67 Wn. App. 378, 391, 835 P.2d 1054 (1992). Here, Jill's assertion that she is "virtually dependent on [spousal

10

maintenance] for her survival"[9] is undermined by the court's observation that her net worth now exceeds $2 million. In light of the evidence and both parties' situations, it was reasonable for the trial court to conclude that Jack's reduction in income was involuntary and constituted a substantial change in circumstances justifying modification. The court did not abuse its discretion.

Both Jill and Jack request an award of attorney fees on appeal. Jill includes one sentence in her brief, purporting to "reserve[ ] the right to an award of attorneys fees and costs."[10] Jack argues that RCW 26.09.140 supports an award on the basis that Jill's briefing includes erroneous citations to the record and that he has paid more in legal fees. RCW 26.09.140 gives this court discretion to award attorney fees to either party based on the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay. In re Marriage of Pennamen, 135 Wn. App. 790, 807-08, 146 P.3d 466 (2006). The trial court made no award of attorney fees below. Under all the circumstances here, we decline to award fees and costs to either party on appeal.

## CONCLUSION

Substantial evidence supports the trial court's findings, and those findings support the court's conclusions of law. The trial court did not abuse its discretion in finding that Jack met his burden to prove a substantial change in circumstances warranting a modification of spousal support.

---

[9] Br. of Appellant at 32.
[10] Br. of Appellant at 34.

We affirm the trial court's order on revision. We decline to award appellate attorney fees and costs to either party.

_Trickey, J_

WE CONCUR: