

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parentage of: | ) | No. 38073-4-III |
| | ) | |
| S.F.† | ) | |
| | ) | |
| Minor Child, | ) | |
| | ) | |
| RACHEAL TEEPLES, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STERLING FOSNOW, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, A.C.J. — Racheal Teeples appeals a final parenting plan

wherein her son, S.F., is placed with his father, Sterling Fosnow. We conclude that the

trial court did not misapply the law or abuse its discretion, and affirm its decision. We

also deny Mr. Fosnow's request for attorney fees and Ms. Teeples's request for sanctions.

---

† To protect the privacy interests of the minor child, we use his initials throughout
this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct.
App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.wa.gov/
appellate_trial_courts.

FACTS

Racheal Teeples and Sterling Fosnow began dating in June 2013. They had a child together, S.F., on July 31, 2014. The parties separated soon after S.F.'s birth.

Around when S.F. was born, Mr. Fosnow's job required months-long travel to various areas in Washington. Mr. Fosnow saw S.F. infrequently during this period. In November 2014, the parties got back together and lived together for a few months. Then in February 2015, Ms. Teeples and S.F. moved to an apartment in Metaline Falls, and Mr. Fosnow moved to Hanford for a job. Between March and July 2015, Mr. Fosnow saw S.F. every other weekend. Sometimes Mr. Fosnow would take S.F. for a night, and other times they would visit with Ms. Teeples there.

In July 2015. Mr. Fosnow was arrested for domestic violence against Ms. Teeples. Ms. Teeples sought a restraining order. After the order was dropped, Mr. Fosnow resumed seeing S.F. sporadically.

In August 2016, Mr. Fosnow lost his driver's license after driving while intoxicated. Afterward, Mr. Fosnow contacted S.F. primarily by telephone unless he had friends or relatives passing through town. He saw S.F. about four times from October to December 2016. In early 2017, Mr. Fosnow went to intensive outpatient treatment for alcohol and eventually got his license back in July 2017.

*Procedure*

On August 31, 2017, Ms. Teeples filed a proposed parenting plan wherein S.F. would reside with her and have up to four hours per week of supervised visitation with Mr. Fosnow. She claimed Mr. Fosnow had intentionally abandoned S.F. for an extended time and had neglected S.F. by substantially refusing to perform his parenting duties. Her proposal also indicated that Mr. Fosnow had a history of domestic violence and substance abuse and that he lacked emotional ties with S.F. She requested Mr. Fosnow be evaluated and treated for substance abuse issues, enroll in a domestic violence treatment program, and complete a parenting class.

After numerous failed attempts at personal service, the trial court granted Ms. Teeples's motion for default. Mr. Fosnow then responded to the petition, disagreeing with Ms. Teeples's claims and filing his own proposed parenting plan. His proposal included full weekend visits with S.F. every other week.

The court held a hearing on March 1, 2018. The court vacated the order on the motion for default, noted that Mr. Fosnow's pleadings showed claims with merits, and continued the hearing on the temporary parenting plan.

On March 15, 2018, the court entered a temporary parenting plan. The order reserved the issue of limitations pursuant to RCW 26.09.191 and other potential

problems. Under the order, S.F. was to live with Ms. Teeples except when scheduled to visit with Mr. Fosnow for five hours on Fridays and/or Saturdays. The order set a review hearing to address amending the plan to include overnight visitation.

On May 17, 2018, the court entered an amended temporary parenting plan. The plan indicated neither parent had limitations or other problems that may harm S.F.'s best interests. The plan changed Mr. Fosnow's visitation to every other week from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

On October 17, 2018, Ms. Teeples moved for an immediate restraining order protecting S.F. from Mr. Fosnow. She alleged S.F. came home from Mr. Fosnow's house with unexplained bruises and that he "is ripping off his fingernails, acting irratically [sic], cursing, and being more violent to others." Sealed Clerk's Papers (SCP) at 133. She claimed these behaviors never occurred before S.F. started visits with Mr. Fosnow. She requested the court appoint a guardian ad litem (GAL) if the court deemed it necessary and that the temporary parenting plan be modified.

The court granted Ms. Teeples's immediate restraining order and set a review hearing. On November 1, 2018, the trial court appointed GAL Wendy Andres, suspended the May 2018 temporary parenting plan, and ordered S.F. to reside with Ms. Teeples pending a review hearing. On November 15, the court entered a temporary parenting plan

4

where S.F. was to live with Ms. Teeples and visit with Mr. Fosnow on the first, second, and fourth weekends of every month. The court also ordered the parties to attend mediation.[1]

In January 2018, Ms. Andres filed a motion for instruction with the court. She reported that Ms. Teeples's father, David,[2] called her "in a rage, yelling and cursing at me about how upset he was regarding my report about him." SCP at 193. David threatened that "if anything happened to his grandson he was going to 'have some asses.'" SCP at 193. Ms. Andres took this as a direct threat. Shortly thereafter, Mr. Fosnow called Ms. Andres and told her that David recently said he was ready to shoot Ms. Andres, referring to her as "'the bitch.'" SCP at 194.

Ms. Andres took these threats seriously because, during her investigation, she learned of an incident where David picked S.F. up from school and became "enraged, screaming and cursing" at S.F.'s teacher such that the school "enlisted a resource officer to stay with the teacher in class as they were concerned for her safety." SCP at 194. Ms. Andres noted: "I do not believe Ms. Teeples had any knowledge that her father would

---

[1] The parties attended mediation on February 25, 2019. No resolution was reached.

[2] Because he shares a last name with Ms. Teeples, we refer to Mr. Teeples as "David" for clarity. No disrespect is intended.

behave this way and I don't believe it was her intention to have me threatened." SCP at 194.

In late January 2019, S.F. came back from Mr. Fosnow's with a bite mark on his chest. Mr. Fosnow told Ms. Teeples that his girlfriend's young child, A., bit S.F. Ms. Teeples inspected S.F. and found four more bite marks on his back. Ms. Teeples reported the injuries to law enforcement and brought S.F. to the emergency room. A patient information report indicated S.F. had a contusion from a human bite and prescribed Tylenol or ice packs. Ms. Teeples requested a limitation on Mr. Fosnow's visitation.

On February 20, 2019, Mr. Fosnow petitioned to change the temporary parenting plan such that S.F. would live primarily with him and visit Ms. Teeples every other weekend. He claimed Ms. Teeples had withheld S.F. from him, had not taken court orders seriously, and her "home environment has become questionable as to [S.F.]'s stability, physical, mental health and well-being." SCP at 221. In his declaration, Mr. Fosnow explained that S.F.'s teachers informed him S.F. had been absent often and failed to meet the requirements for his individualized education plan (IEP). He also expressed concerns about David's behavior.

Ms. Teeples largely denied Mr. Fosnow's allegations. She stated that since the drop-off incident, where she was not present, David had not been accompanying S.F. to

exchanges. She stated there was no basis to change S.F.'s placement with her, as there had been no change in circumstance other than the alleged biting incident under Mr. Fosnow's watch.

On March 21, 2019, the court denied Mr. Fosnow's motion to modify the temporary parenting plan, finding an insufficient basis to change primary placement pending trial. The November 15 temporary parenting plan—where S.F. lived with Ms. Teeples but visited Mr. Fosnow three weekends per month—remained in effect.

Trial on the final parenting plan was set for January 2020, but was continued to allow the GAL report filing and counsel to prepare.

On March 6, 2020, S.F. told Mr. Fosnow that Ms. Teeples's brother, Daniel "Boone" Abbott Teeples, had been sleeping at Ms. Teeples's house. S.F. was upset and Mr. Fosnow believed Daniel[3] may have touched S.F. inappropriately. S.F. said Daniel would "flick" his penis, and demonstrated the motion with his fingers. SCP at 463. Mr. Fosnow took S.F. to the hospital, alerted the GAL, and contacted law enforcement. Mr. Fosnow requested that S.F. remain with him while the matter was investigated. The GAL agreed and also stated she was concerned with S.F.'s behaviors. S.F. remained with Mr.

---

[3] Ms. Teeples's brother is referred to by many names in the record. For ease of reference and consistency, this opinion refers to him as "Daniel."

Fosnow during the investigation.

At the April 1, 2020 emergency conference, the court ordered S.F. to continue living with Mr. Fosnow until a forensic interview was completed. On April 8, the court ordered S.F. to return to Ms. Teeples with express instructions to prohibit contact with Daniel and to set up counseling for S.F. The order indicated that the November 2018 temporary parenting plan should resume.

### Pretrial GAL report

On September 28, 2020, Ms. Andres filed her final report. She interviewed 19 people and reviewed numerous documents, medical records, agency records, and court filings. Ms. Andres was primarily concerned with the allegations of abuse by Daniel and Ms. Teeples's reactions to them. She found Ms. Teeples did not pursue avenues to ensure S.F.'s safety following the alleged incident and denied any possibility that Daniel could have assaulted S.F. Daniel was expressly prohibited from being around S.F., yet S.F. reported seeing Daniel on several occasions. Ms. Andres also expressed concern that S.F. had not been consistently attending trauma therapy, which is typically done weekly. According to the therapist's notes, the sessions were more often about Ms. Teeples than S.F.

Ms. Andres's next concern was S.F.'s significant cognitive delays and the level of commitment shown by Ms. Teeples in ensuring he had the necessary services. In the 2018-19 school year, S.F. missed 18 days and his teachers were concerned for his educational well being. S.F. then missed the first week of the 2019-20 school year due to Ms. Teeples's confusion about the start date. S.F.'s teachers indicated that he also has behavioral issues, which had subsided by the time he came back the following year. He frightened easily and was unable to communicate well with his peers, sometimes hitting or kicking them instead. S.F.'s teachers were concerned that Ms. Teeples was unable to understand his delays and the importance of seeking help for S.F. due to her own cognitive functioning.

Ms. Andres recommended that Mr. Fosnow be granted primary residential placement of S.F. with visitation every other weekend with Ms. Teeples. She also recommended an immediate restraining order be placed protecting Mr. Fosnow and S.F. from Daniel "for as long as the law will allow." SCP at 469.

*Trial*

The parties went to trial on December 2, 4, and 8, 2020. The witnesses were Ms. Andres, the GAL; Mr. Fosnow; Mark Duxbury, the Newport Police Chief; Tina Van

Zandt, S.F.'s trauma therapist; Lori Massey and Jessica Coston, S.F.'s teachers; Lakoda

Lindback, Mr. Fosnow's girlfriend; and Ms. Teeples.

*Ms. Andres*

Ms. Andres could not determine the nature of Mr. Fosnow's relationship with S.F.

before she started the case. She learned of the domestic violence incident between the

parties through police and Child Protective Services (CPS) reports, but did not believe

Mr. Fosnow had anger issues despite Ms. Teeples's assertions to the contrary. Ms.

Lindback's former partner (and A.'s father) told Ms. Andres he feels A. is very safe living

with Mr. Fosnow. Ms. Andres noted that after he was arrested for driving while under the

influence (DUI), Mr. Fosnow successfully completed treatment and probation and is free

of any further supervision.

Ms. Andres completed a second interview at Mr. Fosnow's home after the biting

incident. She asked S.F. about it, and he replied Ms. Teeples told him A. is bad. Ms.

Andres thought S.F. and A. got along fine. Ms. Andres saw that S.F. had a secure

attachment to Mr. Fosnow and was very comfortable in the home. S.F. also showed

affection for Ms. Lindback.

When Ms. Andres interviewed Ms. Teeples, she spoke disparagingly about Mr.

Fosnow while S.F. was around and refused to stop doing so. Ms. Andres noticed

concerning behaviors from S.F. at the November 2018 home visit: "He was delightful and excited, but he was also very hyperactive, . . . he would start to get hyperactive and start slapping himself in the face repeatedly . . . ." Report of Proceedings (RP) (Dec. 2, 2020) at 42. S.F. told Ms. Andres that he liked visiting his dad but he puked while he is there. He said this as "a matter-of-fact statement" without showing "any signs of fear or distress." RP (Dec. 2, 2020) at 43. Then S.F. did not want Ms. Andres to leave and physically blocked the door to his room. Still, Ms. Andres opined that S.F. is primarily attached to Ms. Teeples, who had been his primary caregiver. After Ms. Andres gave her initial report to the court, Ms. Teeples refused to have any further contact with her.

Ms. Andres interviewed S.F.'s teachers, who said S.F. had significant cognitive delays and received services for speech language pathology, cognitive behavior, social skills, and occupational therapy. S.F.'s teachers were "very concerned with the amount of days that he was missing." RP (Dec. 2, 2020) at 56. S.F. had been improving when he attended school, but missed the entire first week of 2020 and several other days. S.F.'s teachers had difficulty reaching Ms. Teeples.

After the allegation of abuse by Daniel, Ms. Andres spoke with CPS and law enforcement. S.F. had been "consistent in his disclosure" throughout the investigation.

RP (Dec. 2, 2020) at 73. She did not believe the allegations of abuse had been resolved because S.F. brought them up again.

*Mr. Fosnow*

Mr. Fosnow explained that early in S.F.'s life, he moved around a lot. He knew that he could not be S.F.'s primary custodial parent when he was away on jobs. He tried to see his son as much as possible but did not have regular contact. He admitted he was not the best father figure in the past and blamed himself because he did not want to see Ms. Teeples. He explained that he "was still going down a bad road" but had since turned his life around. RP (Dec. 4, 2020) at 233.

At the time of trial, Mr. Fosnow had been employed with Colville Towing for over one year. He worked Monday through Friday, from 8:00 a.m. to 5:00 p.m. and was on call for 24 hours every other weekend.

Mr. Fosnow had consistent, regular contact with S.F. since 2018. He described S.F. as his "best friend." RP (Dec. 4, 2020) at 207. They did educational activities and spent time outside on the weekends. He asked S.F.'s teacher for recommendations and worked with S.F. to develop skills.

Mr. Fosnow discussed an incident where Daniel dropped S.F. off for a visit. When he opened the car door, "smoke was rolling out." RP (Dec. 8, 2020) at 517. Mr. Fosnow

later texted Ms. Teeples that S.F. "was acting like he was stoned" and he had smelled marijuana in the car. RP (Dec. 8, 2020) at 517. Ms. Teeples acknowledged that Daniel would not be around S.F. anymore.

Mr. Fosnow's girlfriend, Ms. Lindback, testified that she and Mr. Fosnow frequently discussed strategies to help S.F. with his developmental needs. They focused on different skills each weekend, including educational curriculum. Mr. Fosnow was very involved in S.F.'s schooling. In the month S.F. stayed at their home, he thrived.

### *Mark Duxbury*

Mark Duxbury is the Chief of Police for the Newport City Police Department. He met Ms. Teeples while attempting to locate Daniel for an arrest warrant. Ms. Teeples was cooperative and permitted Chief Duxbury to search her apartment, without reservation.

Chief Duxbury was later assigned to investigate the abuse allegations against Daniel. Ms. Teeples had been cooperative in that investigation, and Daniel had not been charged with any crimes. Still, Chief Duxbury concurred with the GAL report recommending that Daniel stay away from Ms. Teeples's apartment. He told Ms. Teeples and her landlord that Daniel was trespassed from the premises.

Chief Duxbury believed Ms. Teeples had been truthful, but suspected Daniel may have babysat S.F. more often than Ms. Teeples claimed. He explained: "My concern was

the personality of [Daniel] being extremely pushy, rude, described as a very loud-mouthed bully even to law enforcement. And the fact that [Ms. Teeples is] a very soft-spoken, mild-mannered person. And I was concerned if she had the ability to stand up to him if he became violent." RP (Dec. 4, 2020) at 261. He was also concerned with S.F.'s "ability to relay any abuse and be able to articulate that in the case where it could be, you know, prosecuted." RP (Dec. 4, 2020) at 261.

When asked about Ms. Teeples's reaction to the abuse allegations, the following exchange took place:

> [CHIEF DUXBURY]: Well, initially [Ms. Teeples] didn't believe that it would occur or could have occurred. As we progressed through the interview, she actually began volunteering additional information that would be consistent with a child being victimized. She spoke of being contacted by the preschool and them noting a major change in [S.F.]'s behavior, acting out and some violence at school. Which after discussing with her, she agreed that . . . the behavior changed or was in the direct time where [Daniel] was watching . . . [S.F.].
> THE COURT: Did you get the overall impression she was supportive of the investigation?
> [CHIEF DUXBURY]: Yes. She cooperated.
> THE COURT: Okay.
> [CHIEF DUXBURY]: She wasn't appreciative of the allegations, but she cooperated and did anything that I asked of her.

RP (Dec. 4, 2020) at 265.

*Tina Van Zandt*

Ms. Van Zandt is a trauma therapist for the Family Crisis Network. She looks for trauma symptoms in children, but cannot "speak to whether trauma occurred or not, unless they disclose." RP (Dec. 4, 2020) at 272. Ms. Van Zandt met S.F. in April 2020 after the allegations of abuse. She looked for symptoms of trauma in S.F. and, after spending time with S.F. during five sessions, concluded that he did not need trauma services. During the therapy, Ms. Teeples's interactions with S.F. were appropriate, she engaged in play, and provided comfort. It appeared their relationship was strong. Ms. Teeples seemed appropriately concerned about whether trauma had occurred.

In October 2020, Ms. Van Zandt told Ms. Teeples that she did not feel her services were beneficial to S.F. because he was not displaying trauma symptoms. Ms. Teeples brought S.F. to a few more sessions, but later e-mailed Ms. Van Zandt after to tell her that she would not bring S.F. back for more counseling.

*S.F.'s teachers*

Jessica Coston was S.F.'s special education preschool teacher. When she met S.F., he was evaluated and placed in the category of "developmentally delayed" in some areas, lacked social skills, and "had some choice words at times." RP (Dec. 4, 2020) at 319. He

15

"had behaviors that were not appropriate for school or any three- or four-year-old should have." RP (Dec. 4, 2020) at 332.

Throughout preschool, S.F. improved some but was frequently absent. Attendance in preschool is not mandatory, but "it's agreed that they will attend." RP (Dec. 4, 2020) at 324. Absence affects students in special education more than other children. When Ms. Coston addressed attendance issues with Ms. Teeples, S.F.'s attendance improved slightly. When school went to remote learning, Ms. Teeples did not return S.F.'s school packets.

Ms. Teeples was not present when David yelled at Ms. Coston. Ms. Teeples called Ms. Coston afterward and apologized for not telling her David was to pick up S.F. and then apologized for David's behavior. The incident did not influence what Ms. Coston told the GAL.

When Ms. Coston spoke with Ms. Teeples about S.F.'s IEP, she had to repeat herself numerous times. When she first told Ms. Teeples about S.F.'s need for special education, Ms. Teeples "was in tears and kind of gave us a background history of [S.F.], and we went over things that had happened in his life." RP (Dec. 4, 2020) at 331-32. It seemed Ms. Teeples "felt guilty and wanted to know how to help [S.F.] and do what he

needed." RP (Dec. 4, 2020) at 337. Ms. Coston was not aware of the parties' history

other than Mr. Fosnow having little contact with S.F. until this case began.

When Ms. Coston talked to Mr. Fosnow about S.F.'s needs, "He got very involved,

and he would call and ask specifics. And then as we would tell him how to do it and how

to work with [S.F.], then he would follow through." RP (Dec. 4, 2020) at 333.

S.F.'s kindergarten teacher, Lori Massey, stated Mr. Fosnow "seemed to be, you

know, a very interested, involved parent." RP (Dec. 4, 2020) at 294. Similarly, Ms.

Teeples "seemed interested and wanting to find out what, you know, what all he's going

to be doing in kindergarten." RP (Dec. 4, 2020) at 295. Ms. Massey did not see any

deficiencies in Ms. Teeples, but had not interacted with her after the first conference.

S.F. seemed to be doing well in kindergarten: "his attendance has been pretty good" and

he has not had any behavioral issues. RP (Dec. 4, 2020) at 296.

*Ms. Teeples*

Ms. Teeples had lived in the same apartment since 2015. At the time of trial, she

lived there alone, but Daniel had lived there for some time in 2019. Daniel has not been

there since the abuse allegations, and she has worked with law enforcement and her

landlord to ensure he does not come to the apartment. When asked about concerning

posts on Daniel's Facebook page, Ms. Teeples replied that she had not seen his profile

recently because she blocked him after he was trespassed from her home. She agreed that a person who posted certain content, including statements about killing people and references to sexual toys, would not be credible or appropriate enough to be around S.F.

Ms. Teeples remembered Mr. Fosnow telling her that her car smelled like marijuana when Daniel dropped off S.F., but stated, "I wasn't there so how do I know." RP (Dec. 8, 2020) at 480. She agreed that S.F. should not be in a car with marijuana smoke but denied knowing anything about it.

At the time of trial, Ms. Teeples was not employed and was available to care for S.F. all of the time. She last worked part time at the Kalispel Casino where her shifts ended at 2:00 a.m. During that time, S.F. would sleep at David's house until Ms. Teeples got out of work, then she would bring him home by 3:00 a.m.

Ms. Teeples took S.F. to play outside, ride his bike, or play with the neighbors. She made sure he was fed, clothed, and adequately groomed. She helped him with remote learning and played online reading games with him. Ms. Teeples believed S.F. felt safe with her, they had a strong and stable relationship, and it would be detrimental for S.F. to be away from her.

18

Ms. Teeples explained S.F. was absent from school when she had appointments with her attorney in Spokane and when he was sick. She was not comfortable leaving S.F. at school if she was out of town and did not seek help from others.

During the first years of S.F.'s life, Ms. Teeples gave Mr. Fosnow "plenty of time" to spend with S.F., but he left her and was too busy to see S.F. RP (Dec. 8, 2020) at 418. She was concerned that Mr. Fosnow did not have a home and did not communicate well when he had S.F.

Ms. Teeples did not agree with the GAL report and felt Ms. Andres lied about her. After the report was filed, Ms. Teeples stopped talking to Ms. Andres because she "kept turning my words around, saying stuff that I was not saying" and "was not being fair throughout the whole case . . . ." RP (Dec. 8, 2020) at 438. Ms. Teeples did not believe the allegations about Daniel in the GAL report were consistent with law enforcement's investigation. The following exchange took place:

> [MS. TEEPLES'S COUNSEL:] Do you have any objection to [Daniel] being prohibited from ever being around [S.F.]?
> [MS. TEEPLES:] Yes. To a certain extent.
> [MS. TEEPLES'S COUNSEL:] Well, you better tell me what that is.
> . . . .
> THE COURT: . . . You asked her if she wanted to have the uncle as part of her child's life. She said yes. I'd like to—I'd really like to hear the answer to this.

19

[MS. TEEPLES'S COUNSEL:]  You said you want Daniel Abbott around your son, why?

. . . .

[MS. TEEPLES:]  Because I do not believe that of what Mr. Fosnow and his girlfriend are accusing him of.

RP (Dec. 8, 2020) at 455-56.

The parties rested and the court took the matter under advisement.

*Oral ruling*

On December 17, 2020, the court made its oral ruling.  The court began by explaining:

It's clear from the testimony . . . that for the first three years of [S.F.]'s life Mr. Fosnow was not regularly present, he worked multiple jobs around Eastern Washington, but he did make attempts to see his son when he could. At one point in time his driver's license was suspended due to a DUI conviction, and visits during that period of time were, likewise, infrequent.

. . . .

Ms. Teeples was or has been the primary caregiver for [S.F.] during that same period of time and is the person that [S.F.] has resided with for the majority of his life.

In deciding a parenting plan for these individuals, I need to take into consideration what occurred in the past.  I'm also obligated to take into consideration what is currently going on . . . [and] predicting the future to fashion a parenting plan that gives [S.F.] the best possible future.

RP (Dec. 17, 2020) at 626-27.

The court explained that RCW 26.09.187(3) governs residential provisions of a

parenting plan. Before determining the appropriate schedule, the court considered

whether any limitations should be placed on either parent. It explained:

> Mr. Fosnow . . . does not believe that there is any basis to limit contact with respect to either parent.
>
> Ms. Teeples has alleged two bases, abandonment and neglect. Ms. Teeples believed that this finding is supported by the fact that Mr. Fosnow was an absentee father for the first three years of his child's life, his employment and living situation back then were not stable, and consequently his contact with his son was limited and infrequent.
>
> If I were sitting and deciding this case about the time when it was filed, I believe that such a finding would be appropriate. However, I also know that the testimony did establish that Mr. Fosnow did make an effort in the early years, granted it was minimal, to see and be part of [S.F.]'s life. When he had the resources available to himself to get to Pend Oreille County, he did so.
>
> The testimony established that there were times when he was able to see his son for an entire weekend at a stretch . . . [and] also that these visits were not regular. And he actually did not know what to expect, as there were times where Ms. Teeples would allow him to have unsupervised contact with the child and other times she would place parameters. . . .
>
> Ultimately, when I look at what is going on since this action has been filed . . . I do not find that there's any basis to determine that there are any limiting factors.

RP (Dec. 17, 2020) at 627-29.

The court then discussed the seven factors in RCW 26.09.187(3), which it

addressed in reverse order. With regard to factor seven, the parents' employment, the

court found the factor weighed in Mr. Fosnow's favor. The court noted that Mr. Fosnow

worked Monday through Friday and would require afterschool care for some hours, but Ms. Lindback was free to care for the children then. The court found Ms. Teeples was not currently working, but previously worked late and would pick S.F. up in the middle of the night to bring him home on school nights.

With regard to factor one, the relative strength, nature, and stability of S.F.'s relationship with each parent, and factor three, the past and future potential for performance of parental functions, the court began by discussing Mr. Fosnow:

> For Ms. Teeples's position, the argument boils down essentially to one argument. Mr. Fosnow was an absentee father in the past. He didn't have a stable job and he moved around a lot. That is her argument as to why that should be considered as the best predictor for the future.
>
> However, Mr. Fosnow currently has held the same job with Colville Towing for a longer period of time and he's also been in a stable relationship for an extended period of time, in which he currently co-parents his girlfriend's daughter and has the full support of the parent from that relationship as well.
>
> However, if Mr. Fosnow's job or relationship were to somehow go away, there's nothing—that stability goes away, but there's nothing currently in the record before me that that is a possibility.
>
> While in Mr. Fosnow's care I note that nothing negative has happened to [S.F.]. There have been allegations but nothing has been proven out. The biting incident I note is inconsequential. . . . [Ms. Teeples] also alleges that during his time with his father that [S.F.] pulls out his nails and throws up. The testimony established that these events either did not occur or were exaggerated.
>
> There was much discussion about Mr. Fosnow's criminal history. Was there a DUI, was there an assault, yes. However, in both cases Mr. Fosnow had successfully completed his court obligations and has not had

22

any criminal activity that would somehow negatively impact his ability to
parent.

Mr. Fosnow also told me that he has looked into schooling and
medical options in the event [S.F.] is placed with him. He testified that
medical appointments have been made. [S.F.]'s teachers likewise testified
that he has reached out in the past and has taken an active role in wanting to
know what his son's issues are and how best to address them.

Both he and Ms. Lindback testified that they work regularly with
[S.F.] . . . to work on those deficiencies. This demonstrates to me a
behavior of being proactive in his child's life.

RP (Dec. 17, 2020) at 632-33.

The court went on to discuss Ms. Teeples at length:

On the flip side, Ms. Teeples has been the primary parent for [S.F.]
for his entire life, and this fact cannot be overlooked. This is a factor I
struggled with the most. But when I look back at what . . . [the] RCW
requires me to take into consideration, it requires me to take into
consideration not only the length but also the nature of the relationship.

Just because there has been a long-term relationship does not mean
that it has been healthy. When I look at the testimony that was presented
about Ms. Teeples' parenting style, the word reactionary comes to mind.
[S.F.] was evaluated by medical professionals and was referred to school
for additional services to be provided.

The testimony from Ms. Coston was that [Ms. Teeples] was in tears
when she found out that her child had educational deficiencies and was
going to need extra help. So she got him enrolled in classes but then did not
follow through and attendance was not regular. The school notified her
about these attendance issues, and ultimately it came down to a court order
directing her to have [S.F.] attend these classes.[4] She justified this by
saying she had to go to appointments.

---

[4] The record contains no court order about S.F.'s attendance but the GAL report
noted that the court "had to warn" Ms. Teeples about the issue. *See* SCP at 465. This
likely occurred at a hearing, the transcripts of which are not in our record.

23

Her work schedule. There was testimony about her working graveyard shift and getting off at two o'clock in the morning. . . . [S]he leaves [S.F.] with her father, wakes him up in the middle of the night, even on nights that he has school. This is not consistent or healthy for [S.F.]'s development.

Another issue that I honed in on is the profanity and the behavior that [S.F.] demonstrated when he started preschool. Ms. Coston testified that [S.F.] was using extremely foul language when he first started preschool. She testified that there were also other behavioral issues. She testified that . . . his grandfather came to school, causing a scene to the point . . . she had to be escorted to her vehicle after work. [S.F.]'s grandfather has likewise made threats against the guardian ad litem in this case.

This is an individual that has, it appears from the record, regular contact with his grandson. And it is my belief that people's behavior in pubic is a more restrained version of how they behave in private. Children are sponges, they repeat what they hear at home. The behaviors they see adults displaying becomes what is normal for them.

Next we have the issue of [Daniel]. Chief Duxbury testified that the first time he ever met Ms. Teeples was when he was trying to arrest [Daniel] on an active warrant . . . . Having warrants should have been a red flag for Ms. Teeples.

Then we move forward to the abuse allegation. Chief Duxbury testified that he believed Ms. Teeples was minimizing how much one-on-one contact [Daniel] had with her son. I struggled to see why Ms. Teeples felt it was appropriate to leave her child with an individual she knew had warrants. . . . Chief Duxbury also testified that the abuse allegation is still an open investigation and he actively is wanting to interview [Daniel] about it.

[S.F.]'s descriptions of the allegations and his behaviors lead me to believe that something occurred that was abusive in nature. He describes these events to adults that is consistent with what a child his age and development is capable of communicating. . . .

Likewise, there was testimony during the trial that during one exchange Ms. Teeples' vehicle smelled of marijuana. Ms. Teeples was cross-examined on this issue but would not firmly commit to an answer, but

acknowledged that it was a possibility that [Daniel] had been smoking marijuana while driving [S.F.] to an exchange.

Despite all of these things, Ms. Teeples indicates she would permit [Daniel] around her son but agrees not to do so at the recommendation of law enforcement and her landlord. I have grave concerns about this and her willingness to actually communicate to authorities regarding [Daniel] coming around.

The counseling with Ms. Van Zandt is likewise concerning for me. [S.F.] was enrolled in counseling with Ms. Van Zandt as part of the abuse investigation involving [Daniel]. She testified that she did not observe any evidence of trauma in [S.F.]'s behaviors. However, she was not able to make . . . an opinion as to one way or the other if abuse occurred.

. . . .

. . . Ms. Teeples is the one that decides to cut short the counseling with Ms. Van Zandt. Again, I struggle to see why this is done. Ms. Teeples had made allegations of abuse that were occurring in Mr. Fosnow's home, she has her child enrolled in an area that would address these issues, and she decides that she's going to terminate treatment.

RP (Dec. 17, 2020) at 633-37.

The court summarized:

Has [S.F.] spent the bulk of his life with his mother? Yes. But the nature of that time has been troubling. Negative things happened to [S.F.] when he is in Ms. Teeples' care. And she must be prompted to address those by someone from the outside. Even when she's prompted to address these issues, her follow-through is not consistent and sometimes she makes the solution more about her needs rather than the needs of [S.F.].

RP (Dec. 17, 2020) at 637-38.

25

The court ultimately awarded primary custody of S.F. to Mr. Fosnow, as recommended by Ms. Andres. It deviated from Mr. Fosnow's proposed plan and ordered more frequent visitation with Ms. Teeples.

Consistent with the court's oral ruling, the final parenting plan indicated there were no reasons for putting limitations on either parent pursuant to RCW 26.09.191. Under the final plan, S.F. lives with Mr. Fosnow and visits Ms. Teeples every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m.

Ms. Teeples timely appealed.

## ANALYSIS

RESIDENTIAL TIME LIMIT "LIMITED PLAN"

Ms. Teeples contends the trial court erred in limiting her parenting time despite finding no limitations under RCW 26.09.191. Mr. Fosnow responds that the parenting plan does not limit Ms. Teeples's time and there is no presumption of equal parenting time. We set forth the relevant standards and law before addressing the parties' arguments.

We review a trial court's parenting plan for abuse of discretion. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012) (*Katare* IV). The court's discretion is guided by several provisions of the Parenting Act of 1987, chapter 26.09 RCW. *Id.* at 35-

26

36.  RCW 26.09.187(3) enumerates the general factors to consider when creating a parenting plan, unless limitations under RCW 26.09.191 are dispositive.

Under RCW 26.09.191(2)(a), a court is required to place limitations on residential time if it finds a parent has engaged in certain conduct including willful abandonment and a history of domestic violence.  Under RCW 26.09.191(3)(a), the court may consider whether a parent's neglect or substantial nonperformance of parenting functions should preclude or limit provisions of the parenting plan.

"The 'limitations' in [RCW 26.09.191] are fundamentally different from the provisions necessary to every parenting plan under RCW 26.09.187." *In re Marriage of Chandola*, 180 Wn.2d 632, 644, 327 P.3d 644 (2014).  For example, RCW 26.09.191 permits a trial court to limit a parent's geographic location, travel, and other conduct, which it may not do in a parenting plan under RCW 26.09.187.  *Id.* at 644-45; *see also* RCW 26.09.191(2)(m)(i) (limitations may include supervised contact, completion of counseling, or restraint of all contact if reasonably calculated to protect the child from physical, sexual, or emotional abuse).

Ms. Teeples argues that the trial court's parenting plan substantially limited her residential time, yet it made no findings related to RCW 26.09.191.  Her argument is flawed.

First, the parenting plan does not impose any limitations as described by RCW 26.09.191. Indeed, the court expressly found that there were no reasons for putting limitations on either parent. The plan provides that S.F. is to live with Mr. Fosnow except when scheduled to live with Ms. Teeples every other weekend. Residential time for holidays and school breaks is divided equally. The plan requires Ms. Teeples to show proof of car insurance and to put a seat belt on S.F. The court encouraged the parties to "implement the residential schedule flexibly." SCP at 426. Nothing in this plan imposes the type of limitations prescribed by RCW 26.09.191.

Ms. Teeples relies on *In re Marriage of Katare*, 125 Wn. App. 813, 105 P.3d 44 (2004) (*Katare* I) to support her position that the trial court must make findings associated with limitations before limiting a parent's residential time. In *Katare* IV, the mother requested restrictions on the father's visitation time due to a fear that he would take their children out of the country. 175 Wn.2d at 30-31. The court found RCW 26.09.191(3) inapplicable, yet entered a parenting plan imposing the requested restrictions. *Katare* IV, 175 Wn.2d at 31. The father appealed, and the Court of Appeals remanded, holding that restrictions under RCW 26.09.191(3) must be supported by an express finding that the parent's conduct is adverse to the best interests of the child. *Katare* IV, 175 Wn.2d at 31-32 (citing *Katare* I, 125 Wn. App. at 826).

28

On remand, the trial court listed factors justifying the limitations but still found the father presented no serious threat of abducting the children. *Id.* at 32 (quoting *In re Marriage of Katare*, noted at 140 Wn. App. 1041, 2007 WL 2823311, at *2-3 (*Katare* II). The Court of Appeals again found these findings deficient and remanded. *Id.* at 32-33 (citing *Katare* II, 2007 WL 2823311 at *2-3). On second remand, the trial court entered detailed findings that the risk of abduction had not abated and it was in the best interests of the children to maintain the travel restrictions. *Id.* at 34. The Court of Appeals affirmed. *Id.* at 34-35 (citing *In re Marriage of Katare*, noted at 159 Wn. App. 1017, 2011 WL 61847, at *10 (*Katare* III)). The Supreme Court affirmed, holding that the restrictions were supported by substantial evidence. *Id.* at 36.

*Katare* is not helpful to Ms. Teeples. *Katare* I and II simply held that the trial court erred by imposing restrictions under RCW 26.09.191 without making specific findings. After two remands, the trial court *did* enter findings to support the restrictions and the trial court's order was ultimately affirmed. *Katare* IV, 175 Wn.2d at 36. Conversely, here the trial court's parenting plan imposed no restrictions under RCW 26.09.191, and it was therefore not required to make specific findings under *Katare*.

Mr. Fosnow argues that the final plan does not impose limitations and there is no presumption of equal parenting time. Ms. Teeples replies that because she had been

S.F.'s primary parent, the final plan *does* limit her time. She seems to concede there are no restrictions yet still argues the residential schedule must be justified by findings under RCW 26.09.191. She cites RCW 26.09.002, which states, "the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm." This statute gives guidance to the trial court, but it by no means *requires* that the existing pattern of interaction be maintained. The only requirements placed on the trial court in ordering a parenting plan are imposed by RCW 26.09.187 and .191, not the policy statement cited by Ms. Teeples. *See Marriage of Chandola*, 180 Wn.2d at 642-45.

The parenting plan did not impose restrictions under RCW 26.09.191, and the trial court was not required to make findings pursuant to that statute in order to substantially restrict Ms. Teeples's contact with S.F.

PARENTING PLAN FACTORS

Ms. Teeples argues the trial court abused its discretion in granting primary placement of S.F. with Mr. Fosnow. She takes issue with the trial court's analysis and application of several statutory factors. We address those factors in turn.

Trial courts have broad discretion in deciding a child's residential schedule or placement under RCW 26.09.187. *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). Appellate courts will not disturb a trial court's custody ruling absent an abuse of discretion. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). A trial court abuses its discretion if it misapplies the law or bases its decision on unsupported facts. *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).

The trial court's placement must be in the best interests of the child and requires consideration of the factors in RCW 26.09.187(3), which provides:

> (a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. . . . Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:
> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions related to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

31

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Factor (i) shall be given the greatest weight.

*Factors 1 and 3*

Ms. Teeples argues the trial court erred in examining the nature of her relationship with S.F. (factor 1) in the context of past, present, and future parenting functions (factor 3). Relatedly, she argues the court erred in imputing her family members' actions to her when analyzing these factors. We disagree.

To best address the arguments raised, we provide the definition of parenting functions cross-referenced in RCW 26.09.187(3)(a)(iii):

(2) "Parenting functions" means those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child. Parenting functions include:

(a) Maintaining a loving, stable, consistent, and nurturing relationship with the child;

(b) Attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;

(c) Attending to adequate education for the child, including remedial or other education essential to the bests interests of the child;

(d) Assisting the child in developing and maintaining appropriate interpersonal relationships;

(e)  Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and

(f)  Providing for the financial support of the child.

RCW 26.09.004.

It is clear in RCW 26.09.187(3)(a) that factor 1 (the strength, nature, and stability of the child's relationship with each parent) and factor 3 (each parent's past and potential performance of the parenting functions defined above) overlap.  Most notably, the first statutorily defined parenting function in RCW 26.09.004(2)(a) is "[m]aintaining a loving, stable, consistent, and nurturing relationship with the child."  The trial court's oral ruling demonstrates the difficulty in disentangling these factors.  Practically speaking, examining the nature of the primary custodian's parent-child relationship involves considering the parent's ability to care for all facets of a child's life.  Nothing in the statute requires the trial court to categorically address each factor to the exclusion of the others.  The only clear direction from the RCW 26.09.187(3)(a) is to give the first factor the greatest weight.

We are confident that the trial court was aware that the first factor must be afforded the most weight.  Indeed, it found Ms. Teeples had been S.F.'s primary parent and noted "this fact cannot be overlooked."  RP (Dec. 17, 2020) at 633.  The court went on to explain that it "struggled" with this factor the most before reasoning that the statute

33

requires it to consider "not only the length but also the nature of the relationship."

RP (Dec. 17, 2020) at 633-34.

In ruling on the nature of Ms. Teeples's relationship with her son, the court discussed numerous issues that had been raised at trial. Ms. Teeples had difficulty following through with S.F.'s special educational needs and was "reactionary" in her parenting style. RP (Dec. 17, 2020) at 634. She would wake him up in the middle of the night, which was bad for his development. She terminated S.F.'s trauma therapy despite her own accusations that he was being abused in Mr. Fosnow's home. The court was concerned that Ms. Teeples did not see the gravity of the abuse allegations against Daniel. In sum, the court noted that although S.F. had spent the majority of his life with Ms. Teeples, "the nature of that time has been troubling." RP (Dec. 17, 2020) at 637. The court further noted that bad things happened to S.F. while he was in Ms. Teeples's care, and she was inconsistent about addressing issues. These findings are supported by the testimony at trial and evidence in the record.

Ms. Teeples argues the court failed to address the stability in her home and instead focused on Mr. Fosnow's current stability rather than his past instability. She argues the court overlooked the fact that she had been in the same home for five years and provided for S.F.'s needs for his whole life. Again, the court raised concerns with Ms. Teeples's

care for S.F. and found Mr. Fosnow was more proactive. It found Mr. Fosnow had been in a stable relationship and held the same job for over one year. The court aptly noted that its job was to ensure the best *future* for S.F. It was not required to place greater weight on Mr. Fosnow's past than his present.

Ms. Teeples next argues that, when analyzing factors 1 and 3, the court imputed actions of her family members to her. It is true that both David and Daniel were mentioned when the court addressed the nature of the relationship and past, current, and future parenting functions. Specifically, the court was concerned that David used foul language and caused scenes around S.F., noting that people's behavior in public was often more restrained than in private. The court implied that S.F. may have been learned foul language from David. The testimony established that David had a temper: he reacted angrily and swore at multiple people in S.F.'s life including Mr. Fosnow, Ms. Coston, and the GAL. That S.F.'s behavior may have been influenced by David is a fair inference, and it was mentioned in conjunction with numerous other concerns—unrelated to David—that the court raised with Ms. Teeples's parenting.

Perhaps more importantly, the court found the abuse allegations against Daniel plausible and expressed "grave concerns" that Ms. Teeples may be unwilling to keep Daniel from her son. RP (Dec. 17, 2020) at 636-37. The court in no way imputed

Daniel's behaviors to Ms. Teeples.  Rather, based on the testimony, it found Ms. Teeples might not fully appreciate the gravity of the abuse allegations.  A parent's willingness and ability to protect their child from danger factors into the nature of the parent-child relationship.  Furthermore, parenting functions include "[a]ssisting the child in developing and maintaining *appropriate interpersonal relationships*" and "[e]xercising *appropriate judgment* regarding the child's welfare."  RCW 26.09.004(2)(d), (e) (emphasis added).  The court was concerned about S.F.'s relationship with Daniel and questioned whether Ms. Teeples would exercise appropriate judgment in the future.

Ms. Teeples seems to believe the court failed to take into account that she has taken greater responsibility for performing parenting functions during S.F.'s life. Again, we disagree.

The court noted Ms. Teeples's argument rested on the fact that Mr. Fosnow was an absentee father for the first three years of S.F.'s life, did not have a stable job, and moved around a lot.  But the court reasoned that Mr. Fosnow now has stable employment and a long-term girlfriend, who he co-parents with.  Nothing negative had happened to S.F. while in Mr. Fosnow's care, and any incidents were overblown.  The court noted that Mr. Fosnow had looked into medical and schooling options for S.F. and had been working with Ms. Lindback to address S.F.'s educational deficiencies, demonstrating that Mr.

36

Fosnow is "being proactive in his child's life." RP (Dec. 17, 2020) at 633. Conversely, the court acknowledged that Ms. Teeples had been the primary caregiver, but identified numerous issues with her parenting.

Based on the evidence in the record and the testimony at trial, we disagree that the trial court abused its discretion in considering, analyzing, and applying factors 1 and 3.

*Factor 7*

Ms. Teeples next argues the trial court abused its discretion in finding factor 7 weighed against her. RCW 26.09.187(3)(vii) requires consideration of each parent's employment schedule when devising a parenting plan and to make accommodations consistent with those schedules.

The court acknowledged that Mr. Fosnow's work schedule would require some childcare for S.F. after school, but Ms. Lindback's schedule was "more conducive" since she worked from home and already cared for her own school-aged child. RP (Dec. 17, 2020) at 629. The court found Ms. Teeples was not currently employed and was available to care for S.F. when he was not in school, but also noted that Ms. Teeples's prior work schedule required her to work until 2:00 a.m. and pick up S.F. afterward even on school nights. It found this factor did not weigh in Ms. Teeples's favor.

Factor 7 does not specifically direct the court to consider a parent's current employment schedule. Indeed, the court found Ms. Teeples was voluntarily unemployed. She will ostensibly become employed in the future. Thus, the court's consideration of her most recent job, which resulted in S.F. being awoken in the middle of the night, was not unreasonable. Furthermore, the parenting plan directed Ms. Teeples's visitation to occur during Mr. Fosnow's on call weekends—this demonstrates the trial court fashioned a plan to accommodate existing work schedules.

We recognize that custodial changes can be highly disruptive to children and there is a strong presumption in favor of continuity. *Marriage of McDole*, 122 Wn.2d at 610. Still, the trial court is in the best position to evaluate the best interests of the child due to its "unique opportunity to personally observe the parties." *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989). Given the testimony at trial and the evidence in our record, we cannot conclude that the trial court's decision to grant primary custody of S.F. to Mr. Fosnow was an abuse of discretion. The trial court's oral ruling addressed the statutory factors at length and its ultimate decision was consistent with the GAL's recommendation. *See Fernando v. Nieswandt*, 87 Wn. App. 103, 107, 940 P.2d 1380 (1997) (court may consider GAL's recommendation and testimony).

The trial court did not abuse its discretion in analyzing and applying the factors in RCW 26.09.187.

ATTORNEY FEES

Mr. Fosnow requests an award of attorney fees for defending a frivolous appeal. Ms. Teeples counters that Mr. Fosnow should be sanctioned for failure to comply with RAP 10.3(a)(5). For the reasons set forth below, we deny both parties' requests.

*Frivolous appeal*

Under RAP 18.9(a), this court may order a party who files a frivolous appeal to pay the opposing party's reasonable attorney fees. *Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 170 Wn.2d 577, 580, 245 P.3d 764 (2010). An appeal is frivolous when it "presents no debatable issues and is so devoid of merit that there is no reasonable possibility of reversal." *Streater v. White*, 26 Wn. App. 430, 434, 613 P.2d 187 (1980). When this court affirms because it rejects the appellant's arguments, that reason alone does not make the appeal frivolous. *Granville Condo. Homeowners Ass'n v. Kuehner*, 177 Wn. App. 543, 558, 312 P.3d 702 (2013). We resolve all doubts as to whether an appeal is frivolous in favor of the appellant. *Lutz Tile, Inc. v. Krech*, 136 Wn. App. 899, 906, 151 P.3d 219 (2007).

Mr. Fosnow argues that when reviewing the record, there seems to be no debatable issues and Ms. Teeples fails to present any reasonable basis for reversal. We disagree. Both parties acknowledge that Ms. Teeples had the right to appeal the trial court's order. A trial court's decision on custody matters is highly discretionary and requires a multi-factor analysis that is heavily fact dependent. Ms. Teeples's position—that the trial court substantially limited her contact with S.F. and misapplied the statutory factors—was not so totally devoid of merit as to present no reasonable possibility of reversal. As we explained above, an order granting full custody to one parent after the child had previously resided with the other can be a major disruption in the child's life. This type of ruling is certainly open to differing opinions. That we have rejected Ms. Teeples's arguments does not make her appeal frivolous and, indeed, any doubts on this issue must be resolved in her favor.

Accordingly, we deny Mr. Fosnow's request for attorney fees on appeal.

*RAP 10.3(a)(5)*

Ms. Teeples contends Mr. Fosnow's brief failed to comply with RAP 10.3(a)(5) and sanctions are warranted. We agree that the brief violates RAP 10.3(a)(5) but decline to impose sanctions.

The Rules of Appellate Procedure "enable the court and opposing counsel efficiently and expeditiously to review the accuracy of the factual statements made in the briefs." *Litho Color, Inc., v. Pac. Emp'rs Ins. Co.*, 98 Wn. App. 286, 305-06, 991 P.2d 638 (1999). This court may, sua sponte or upon motion of a party, order a brief that fails to comply with the RAPs to be returned and corrected or struck. RAP 10.7. Sanctions are ordinarily imposed on a party who files an improper brief. RAP 10.7.

Relevant here, appellate briefs must contain a "*Statement of the Case*," which is "[a] fair statement of the facts and procedure relevant to the issues presented for review, without argument." RAP 10.3(a)(5). The rule further requires reference to the record for each factual statement. *Id.*

Ms. Teeples claims Mr. Fosnow does not include references to the record for one-half of the statements. This claim is simply not true. Of the 19 sentences in the "Responsive Statement of Facts," 4 are not cited. Some describe Ms. Teeples's argument as presented in her brief and cite the brief generally. Most of the remaining sentences cite the appellate record.

Ms. Teeples also points out an argument in the "*Statement of the Case*" section, which is opinion and not factual. We agree that this was improper. The final paragraph

in that section contains a two-sentence argument regarding a frivolous appeal, which is later presented in the body of the brief.

Neither of these RAP errors prevented our efficient and expeditious review of the accuracy of the facts. Thus while technically in violation of RAP 10.3, Mr. Fosnow's brief does not warrant sanctions. Had Ms. Teeples truly found the violations egregious, she could have moved for this court to strike the brief. Instead, she seems to be vindictively requesting sanctions in an already contentious custody case.

In conclusion, we deny Mr. Fosnow's request for attorney fees on appeal and decline to impose sanctions on Mr. Fosnow for minor RAP violations.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Pennell, J.

Staab, J.

42